Justice DURHAM,
opinion of the Court:
INTRODUCTION
T 1 During the 2011 legislative session, the Utah legislature passed Senate Bill 165 (S.B. 165), altering the requirements for placing an initiative on the ballot. After an unsucceessful attempt to place a local initiative on the ballot, the sponsors of the initiative challenged several provisions of S.B. 165, contending the amendments violate the right to * initiative and uniform operation of laws provisions of the Utah Constitution and the Free Speech Clause of the federal Constitution. The district court found that the amendments did not violate any of these constitutional provisions. We affirm.
*637 BACKGROUND
{2 Appellants Mara Brenenstall, Paul Brugger, and Merrill Cook (collectively, initiative proponents) are sponsors of an initiative petition entitled "Lawful Employment Ordinance," which would require Salt Lake County employers to comply with an "E-verify" requirement aimed at preserving jobs in Utah for legal residents. After unsucceessful attempts by the initiative proponents to secure the necessary support from the legislature, he sought to place the ordinance on the 2012 general election ballot in Salt Lake County. The initiative proponents filed an initiative application with the Salt Lake County Clerk's Office in June 2011, and used volunteers to collect signatures through April 2012. The county clerk, however, determined that there were not enough signatures to place the Lawful Employment Ordinance on the 2012 general election ballot.
T8 Several months before the initiative proponents filed the application for petition, the state legislature modified the requirements for placing a local initiative on the ballot. Alleging that these amendments resulted in his inability to get enough signatures to place the Lawful Employment Ordinance on the 2012 ballot, the initiative proponents filed a lawsuit against Lieutenant Governor Greg Bell and Salt Lake County Clerk Sherrie Swenson (collectively, the State), seeking a declaration that two of these amended provisions were unconstitutional.
T4 The initiative proponents first challenge was to the number of signatures required to place the initiative on the ballot. Utah Code section 20A-7-501(1)(a) was modified to require initiative sponsors to gather "signatures equal to ... 10% of all the votes cast in the county, city, or town for all candidates for President of the United States at the last election at which a President of the United States was elected," rather than an equal percentage of votes cast in Utah's most recent gubernatorial election as previous iterations of the law required. 2011 Utah Laws 215. The initiative proponents claimed that the 2011 amendment unconstitutionally increased the number of required signatures in Salt Lake County from approximately twenty-three thousand to approximately thirty-nine thousand.
15 Second, the initiative proponents challenged the amended provision requiring initiative sponsors to consign the completed initiative packet and sufficient signatures to the county clerk's office by "the sooner of ... (A) 816 days after the day on which the application is filed; or (B) the April 15 immediately before the next regular general election immediately after the application is filed." Uran CopE® § 20¥-7-506(1)(a). Prior to the 2011 amendment, proponents of statewide initiatives had one year after filing an application to gather the required signatures, while proponents of local initiatives had an unlimited amount of time to gather signatures so long as they were submitted to the county clerk's office by April 15 of the year in which the initiative was to go on the ballot. Utax CopE §§ 20A-7-202(4)(a), 20A~T-506(1) (2010). The 2011 amendments standardized these diverse timetables, requiring both statewide and local initiative sponsors to gather the required number of signatures by the sooner of (a) 816 days after filing an application or (b) the April 15 immediately before the next regular general election. Cope §§ 20A-7-206(1)(a), 20A-7-506(1)(a).
T6 On cross-motions for summary judgment, the district court denied the initiative proponents' declaratory relief claims. The initiative proponents appealed, challenging the constitutionality of the 2011 amendments to the local initiative requirements.
STANDARD OF REVIEW
$7 "Because the issue of constitutionality presents a question of law, we review the trial court's ruling for correctness and accord it no particular deference." Ryan v. Gold Cross Servs., Inc., 903 P.2d 423, 424 (Utah 1995) (internal quotation marks omitted).
- ANALYSIS
T8 The initiative proponents assert that the 2011 amendments to the local initiative requirements are unconstitutional on three separate grounds: first, the challenged provi *638 sions violate the fundamental right to initiative granted under article VI, section 1 of the Utah Constitution; second, the provisions violate the uniform operation of laws under article I, section 24 of the Utah Constitution; and finally, the provisions unconstitutionally infringe upon the right to free speech under the First Amendment to the U.S. Constitution. We disagree with these assertions.
I. THE RIGHT TO INITIATIVE
19 Article VI, section 1 of the Utah Constitution establishes the right of voters to legislate via local initiatives:
The legal voters of any county, city, or town, in the numbers, under the conditions, in the manner, and within the time provided by statute, may ... initiate any desired legislation and cause it to be submitted to the people of the county, city, or town for adoption upon a majority vote of those voting on the legislation, as provided by statute. ...
Utax Const. art. VI, § 1(2)(b). While we recognize that the "reserved right and power of initiative is a fundamental right," Gallivan v. Walker, 2002 UT 89, 1 24, 54 P.3d 1069, it "is not unfettered, but comes with a built-in limitation," Utah Safe to Learn-Safe to Worship Coal., Inc. v. State, 2004 UT 82, ¶ 28, 94 P.3d 217. The constitutional provision establishing the right to initiative also qualifies that right by granting the legislature power to regulate "the numbers, ... the conditions, ... the manner, and ... the time" by which initiatives may be placed on the ballot. UTax Const. art. VI, § 1(2)(b).
T10 Thus, although the legislature is precluded from passing laws that "unduly burden or diminish the people's right to initiate legislation," Gallivan, 2002 UT 89, ¶ 28, 54 P.3d 1069, "[this does not mean ... that the legislature may never pass regulations that have the effect of making it more difficult to enact legislation by initiative," Safe to Learn, 2004 UT 82, ¶ 29, 94 P.8d 217. Statutory regulations of the right to initiative are unconstitutional only if they are unduly burdensome. Id. 34-5, 94 P.3d 217.
"[ 11 The initiative proponents point to the language in the district court's opinion that recognizes "there is a point at which the ratcheting up of required signatures and ratcheting down of time in which to gather those signatures reaches a point where few or no citizen's group could meet the criteria." In connection with this language, the initiative proponents argue for an interpretation of "unduly burdensome" that triggers a constitutional violation whenever a law has the effect of actually preventing a party from reaching the ballot with a specific initiative. They further note that while the lower court has found each provision of the 2011 amendments to be constitutional, individually permissible restrictions can become unduly burdensome when considering their combined effect.
112 As noted above, the right to initiative in Utah is a qualified right, subject to legislative regulation. Thus, while residents of Utah may not be statutorily deprived of the right to initiative, the legislature does possess the power to define the boundaries surrounding its practice, which may have the effect of rendering the ballot-initiative process more difficult. However, increasingly stringent requirements may, individually or in the aggregate, rise to an unconstitutional level if they unduly burden the right of Utah's citizens to initiate legislation. See Gallivan, 2002 UT 89, ¶ 27, 54 P.3d 1069. To avoid this danger, courts weigh the burdens placed on initiative proponents against the legislature's purpose in enacting the regulations to determine whether an enactment unduly burdens the right to initiative. As we stated in Safe to Learn:
In making this determination, a court should assess whether the enactment is reasonable, whether it has a legitimate legislative purpose, and whether the enactment reasonably tends to further that legislative purpose. In evaluating the reasonableness of the challenged enactment and its relation to the legislative purpose, courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose.
2004 UT 32, ¶ 35, 94 P.8d 217.
A. Reasonableness
113 When considering the reasonableness of a statutory provision, we assess *639 both the type and the magnitude of the restriction in burdening the right to initiative. The Utah Constitution explicitly permits the legislature to impose four types of regulations on the right to initiative, namely, regulations that determine "the numbers, ... the conditions, . the manner, and ... the time" whereby legislation may be initiated by direct vote of the people. UraK CoNST. art. VI, § 1(2)(b). Reasonable regulations falling within the above four categories have generally been upheld as constitutional.
114 For example, a statute defining the number of signatures required was upheld by this court where sponsors were required to gather ten percent of the number of votes cast in twenty-six of Utah's senatorial districts in the most recent gubernatorial election. Safe to Learn, 2004 UT 82, ¶ 43, 94 P.3d 217.
115 Similarly, provisions regulating the manner of obtaining signatures have been upheld as reasonable where petition sponsors were limited to utilizing state residents to collect signatures, Initiative & Referendum Inst. v. Jaeger, 241 F.3d 614, 617 (8th Cir. 2001), where sponsors were prohibited from paying cireulators a commission for each signature obtained, id. at 618, where cireulators were required to be of legal voting age, Am. Constitutional Law Found., Inc. v. Meyer, 120 F.3d 1092, 1101 (10th Cir.1997), and where cireulators were required to sign affidavits of compliance prior to circulating, 1d. at 1106.
1 16 Statutory conditions found to permissibly regulate the right to initiative include requiring a quantity of signatures from an established number of elective regions within a state, Safe to Learn, 2004 UT 32, ¶ 43, 94 P.3d 217, establishing a process whereby initiative signers may remove their name and support from the initiative, id. 1% 44, 49, limiting each initiative to a single subject, PEST Comm. v. Miller, 626 F.3d 1097, 1107-08 (9th Cir.2010), requiring a description of the effect of the initiative to appear on the initiative, id., and requiring the subject of the initiative to appear in its title, Campbell v. Buckley, 203 F.3d 738, 746-747 (10th Cir. 2000).
{17 This court has upheld a statute providing a one-year allotment of time within which signatures must be gathered, noting that prior initiative sponsors have qualified for the ballot within six weeks to five months. Safe to Learn, 2004 UT 82, ¶¶ 51-52, 94 P.3d 217.
1 18 Much of the jurisprudence in this area has proceeded on a case-by-case categorical analysis of whether a specific type of restriction is unduly burdensome. But any restriction may on its own, or in connection with other requirements, rise to the level of being an undue burden if legislative requirements vis-a-vis the number, manner, condition, or time are unreasonably restrictive. In contemplating the quantitative level at which restrictions cross the threshold from constitutional regulation to an unconstitutional abrogation of the fundamental right to initiative, courts consider the qualitative net effect of all the relevant statutory restrictions. Whereas in isolation a provision may not rise to the level of being unduly burdensome, the combined effect of multiple, otherwise permissible, provisions may cross that threshold.
«119 This case presents a series of statutes that require local initiative proponents to collect signatures equal to ten percent of the votes cast in the most recent presidential election by April 15 of the election year or within 816 days, whichever occurs first. These provisions establish the number of signatures required and the time frame within which they must be gathered, both of which are within the enumerated restrictions the state legislature may impose upon the right to initiative. Urax Const. art. VI, § 1(2)(b).
T 20 As to the numbers requirement of the amended local initiative statute, it retained the ten-percent-of-votes-cast threshold but changed the referenced office from the previous gubernatorial election to the previous presidential election. In order to assess whether the amended statute unreasonably increases the number of signatures required, we therefore would need to evaluate historical evidence of the number of votes cast for each of these offices in previous elections. But the initiative proponents do not cite any record evidence of the number of votes cast in prior elections, nor have we uncovered *640 such evidence from our independent review of the record. In its ruling on the eross-motions for summary judgment, the district court noted that the initiative proponents claimed that the amended statute increased the number of signatures required from approximately twenty-three thousand to approximately thirty-nine thousand. Absent any record evidence, however, we cannot evaluate this claim. Nor can we determine whether any variance in the number of signatures required was entirely due to the fact that Utah had recently held its first special gubernatorial election outside of the presidential election cycle, which might have led to an artificially low number of votes cast in the previous gubernatorial race.
4 21 Without any evidence of the practical effect of the amendment, we are left with only the language of the statute. And on its face, we cannot say that requiring signatures equal to ten percent of the votes cast in the previous presidential election rather than ten percent of the votes cast in the prior gubernatorial election amounts to a per se unreasonable restriction on the right to initiative.
122 We next examine whether the shortened time requirement imposed by the amended statute unreasonably burdens citizens seeking to place an initiative on the ballot. Although the amended provisions require circulators to collect the required signatures in forty-nine fewer days than we found to be appropriate in Sofe to Learn, there is no evidence that the time restriction amounts to an undue burden. The Tenth Circuit, in ruling on a restriction limiting the duration of initiative petition drives to six months, held that while "some measures might fare better under a longer or indeterminate period, the current deadline [of six months] is not a significant burden on the ability of organized proponents to place a measure on the ballot." Am. Constitutional Law Found., 120 F.3d at 1099. Further, there is no evidence that the initiative proponents' failure to acquire sufficient signatures via an unsponsored and volunteer-driven petition circulation signifies that no unspon-sored and volunteer-driven petition would be able to succeed. Rather, it is possible that the Legal Employment Ordinance simply did not enjoy much popular support. Again, the record contains no evidence on this subject.
23 The initiative proponents further argue that the statute has the effect of forcing initiative circulators to gather most of their signatures during the oppressive winter months, especially at the end of the drive where the momentum should be the greatest. However, a careful reading of the statute demonstrates that initiative sponsors may select any 316-day period within the two years prior to the April 15 preceding the election. See Utan Cope § 20A-7-506(1)(a). Thus, an initiative sponsor may file an application on January 1, receive the approval and packets in February, and have the warm weather of April through October to collect signatures and gather momentum.
1 24 We hold, therefore, that the burdens imposed by the amendments to Utah's initiative process-either individually or in the aggregate-are not unreasonable restrictions under article VI, section 1 of the Utah Constitution.
B. Legitimate Legislative Purpose
(125 We now consider whether an improper legislative purpose in passing the 2011 amendments may void the challenged provisions. Generally, "[t]he authority of the legislature.... is limited ... to the role providing for the orderly and reasonable use of the initiative power." Sevier Power Co. v. Bd. of Sevier Cnty. Comm'rs, 2008 UT 72, ¶ 10, 196 P.3d 583. Legitimate legislative purposes include "deterring fraud, ensuring the efficiency of the process, [and] ensuring modicum of numerical support for an initiative." Gallivan, 2002 UT 89, ¶ 53, 54 P.3d 1069. "The legislature may not, however, impose discriminatory restrictions on the initiative right ... simply for the sake of making it harder to [place an initiative on the ballot] and restricting the initiative power." Id.
{26 No showing of such an illegitimate legislative purpose has been made here. As the State notes in its briefing, Utah had held a special interim election to replace Governor Huntsman, who had recently been appointed as United States Ambassador to China. The *641 State claims that as a result of this irregular occurrence, and under the prior iteration of section 20A of the Utah Code, a significantly reduced number of signatures would have been required in 2011 for an initiative to reach the ballot than in prior years. It is reasonable to conclude that the legislature, | interested in providing for the orderly and reasonable use of the initiative power, acted to maintain a comparable standard of numerical support by which initiatives might reach the ballot during this period. This is a legitimate legislative purpose.
T 27 In weighing the reasonableness of the burdens placed upon the initiative right against the legislative purpose for the restrictions, we conclude that the challenged provisions are reasonable, both individually and in the aggregate, and are supported by a legitimate legislative purpose. These provisions reasonably serve to maintain a consistent threshold of minimal support required before legislation may be placed on the ballot via initiative, promoting an efficient and orderly initiative process. We therefore hold that the challenged provisions do not unduly burden the right to initiative.
IL UNIFORM OPERATION OF LAWS
128 The initiative proponents argue that legislation reducing the number of days to gather signatures and (allegedly) increasing the number of signatures required disadvantages volunteer citizen groups. They assert that these regulations favor well-funded initiative efforts, which can hire signature gatherers, over unfunded initiatives, which rely exclusively on volunteer signature gatherers. The initiative proponents contend this disparate impact violates the uniform operation of laws provision of the Utah Constitution.
129 Article I, section 24 of the Utah Constitution guarantees that "[alll laws of a general nature shall have uniform operation." Urax Const. art. I, § 24. Under this language, "a statutory provision may be unconstitutional if it creates a classification that is discriminatory; that is, if it creates a classification that treats the members of the class or subclasses disparately." Utah Safe to Learn-Safe to Worship Coal., Inc. v. State, 2004 UT 32, ¶ 31, 94 P.3d 217 (internal quotation marks omitted). Further, under the Utah Constitution, a statute may be held unconstitutional both on its face and for any de facto disparate effects on similarly situated parties. Lee v. Gaufin, 867 P.2d 572, 577 (Utah 1993) ("For a law to be constitutional under [alrticle 1, section 24, it is not enough that it be uniform on its face. What is critical is that the operation of the law be uniform. A law does not operate uniformly if persons similarly situated are not treated similarly...." (internal quotation marks omitted)).
 $30 Violations of the uniform operation of laws clause may trigger varying degrees of scrutiny. Safe to Learn, 2004 UT 32, ¶ 31, 94 P.3d 217. The level of serutiny applied turns on whether "a legislative enactment implicates a fundamental or critical right or creates classifications which are considered impermissible or suspect in the abstract." Gallivan v. Walker, 2002 UT 89, ¶ 40, 54 P.3d 1069 (internal quotation marks omitted). Where a statutory provision cere-ates an impermissible classification, heightened serutiny is appropriate. See id.
131 We decline to recognize the inability to employ paid cireulators as defining a constitutionally significant classification. In Safe to Learn, appellants challenged a statute requiring all ballot initiatives to receive , ten percent of votes cast in the prior gubernatorial election in twenty-six of Utah's twenty-nine senatorial districts within one year of filing an application. 2004 UT 32, ¶ 4, 94 P.3d 217. Although the contested requirements necessitated an increased amount of organization, labor, and money to gather signatures across the entire state, we concluded that neither the senatorial district requirement, nor the one-year requirement, created any classifications, "but appllied] equally to all Utah citizens." Id. €38. A similar logic applies here. Although the strictures of the statutory provisions may render the initiative process more accessible to those with greater resources, they apply uniformly to all citizens and do not violate article I, section 24 of the Utah Constitution.
*642 III. FREEDOM OF SPEECH
132 The initiative proponents argue that the challenged provisions violate their right to "core political expression" as protected by the First Amendment's guarantee of free speech. In essence, the initiative proponents assert that Utah's initiative regulations improperly hinder their ability to express their political message by means of a ballot initiative. We disagree.
€33 Numerous cases adjudicated by this court and federal courts have repeatedly distinguished between regulation of the initiative process and discouraging or preventing speech regarding the subject of the initiative. See, eg., Utah Safe to Learn-Safe to Worship Coal., Inc. v. State, 2004 UT 32, ¶¶ 56-57, 94 P.3d 217 (distinguishing statutes that violate the First Amendment by limiting speech from statutes that constitutionally limit the success of initiative petitions via procedural restrictions); Initiative & Reforendum Inst. v. Walker, 450 F.3d 1082, 1099 (10th Cir.2006) ("[The First Amendment protects political speech incident to an initiative campaign," but not "the right to make lawl ] by initiative."); Save Palisade Fruitlands v. Todd, 279 F.3d 1204, 1211 (10th Cir.2002) ("[The right to free speech ... [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech associated with an initiative procedure...."); Skrzypcsak v. Kauger, 92 F.3d 1050, 1053 (10th Cir.1996) (initiative proponent's desire to place an initiative on the ballot not protected by the First Amendment because removing the initiative from the ballot did "not prevent[ ] [the proponent] from speaking on any subject"); Republican Party of N.C. v. Martin, 980 F.2d 943, 960 (4th Cir.1993) ('The First Amendment guarantees the right to participate in the political process. It does not guarantee political success.").
134 In Safe to Learn, an initiative proponent raised a First Amendment claim similar to the claim in this case. There, the initiative proponent argued that the legislature's limits on the right to initiative "impose[d] severe restrictions upon rights of free speech and political expression, and thus [were] subject to strict serutiny under federal free speech analysis." 2004 UT 32, ¶ 53, 94 P.3d 217 (internal quotation marks omitted). This court held that
the provisions of the initiative statute d[id] nothing to restrict speech. Initiative proponents [were] free, and even encouraged, to disseminate their message throughout the state. Nothing in the initiative statute serve[d] to limit the number of messengers available to engage in this sort of political expression. While the regulations may arguably [have made] it more difficult to place an initiative on the ballot, nothing . suggest[s] that there is a protected right to have a particular initiative on the ballot.
Id. 157 (fifth and sixth alterations in original) (internal quotation marks omitted). We affirm our ruling in Safe to Learn, holding that core political expression, as protected by the First Amendment, distinguishes political expression from political activity. See id. 1156-57. Under the 2011 amendments, the initiative proponents were free to print posters, hold rallies, demonstrate, discuss, canvass, campaign, and raise awareness for an E-verify requirement initiative before, during, and after the statutory 816-day period. First Amendment jurisprudence in this case does not guarantee unlimited participation in political activity, nor does it establish a right to political success. Rather, it protects individuals from regulations that directly discourage or prohibit political expression.
135 We therefore find no First Amendment violation in the March 2011 amendments challenged by the initiative proponents.
CONCLUSION
136 We hold that the challenged amendments contained in S.B. 165 do not violate the Utah Constitution's guarantees of the right of the people to initiate legislation or of the uniform operation of the law. Further, the provisions do not violate the federal First Amendment. Thus, we affirm the judgment of the district court.