*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 60**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

COUNT MY VOTE, INC., MICHAEL O. LEAVITT, and RICHARD MCKEOWN,
*Petitioners,*

*v.*

SPENCER J. COX, CURTIS KOCH, BRYAN E. THOMPSON, and
KIM M. HAFEN,
*Respondents.*

No. 20180470
Filed October 10, 2019

On Petition for Extraordinary Relief

Attorneys:

Matthew M. Cannon, Robert P. Harrington, Salt Lake City, for
petitioners

Tyler R. Green, Stanford E. Purser, Salt Lake City, for respondent
Spencer J. Cox

Troy S. Rawlings, Neal C. Geddes, Michael D. Kendall, Farmington,
for respondent Curtis Koch

Brock R. Belnap, Eric W. Clarke, Natalie Nelson, Saint George, for
respondent Kim M. Hafen

Jeffrey R. Buhman, Paula A. Jones, Provo, for respondent
Bryan E. Thompson

J. Morgan Philpot, Alpine, for intervenors Constitution Party of Utah
and Keep My Voice

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS and JUDGE ORME
joined except as to Part II.C.

JUSTICE HIMONAS filed a concurring opinion, in which JUDGE ORME
joined.

JUSTICE PETERSEN filed a dissenting opinion.

Having recused himself, JUSTICE PEARCE does not participate herein; COURT OF APPEALS JUDGE GREGORY K. ORME sat.

———————

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court except as to Part II.C.:

¶1  This case comes to us on a petition for extraordinary writ filed by Count My Vote, Inc., Michael O. Leavitt, and Richard McKeown (collectively, CMV). The petitioners are advocates for a statewide ballot initiative called the Direct Primary Initiative. The proposed initiative would establish a direct primary election path for placement on the general election ballot for persons seeking a political party's nomination for certain elected offices.

¶2  The petition is denied for reasons set forth below.[1] Most of this opinion represents the views of a majority of the court. The final sub-part, II.C., presents the views only of the author of this opinion.

## I.  BACKGROUND

¶3  The Utah Constitution protects the right of "[t]he legal voters of the State of Utah" to "initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation." UTAH CONST. art. VI, § 1(2)(a). But that right is a qualified one. The constitution expressly states that the right is to initiate legislation "in the numbers, under the conditions, in the manner, and within the time *provided by statute*." *Id.* art. VI, § 1(2)(a)(i) (emphasis added).

¶4  The Utah Legislature has designated the numbers, conditions, manner, and time for an initiative to qualify for the ballot. By statute, a statewide initiative can qualify for placement on the ballot only if its proponents satisfy the terms and conditions set forth in Utah Code section 20A-7-201 *et seq.*[2] The applicable terms and conditions include the following:

———————

[1] We issued an order denying this petition on August 24, 2018, noting the time-sensitive nature of the petition and indicating our intent to issue an opinion explaining the basis of our decision. This is the promised opinion.

[2] Some of the relevant statutes were amended in 2019, but the citations in the opinion are to the Code as it stood in 2018.

- Initiative sponsors must hold seven public hearings in regions designated by statute. UTAH CODE § 20A-7-204.1(1)(a).

- Persons gathering signatures must be over eighteen years of age. *Id.* § 20A-7-205(2)(a).

- A person seeking to have an initiative placed on the ballot must obtain "legal signatures equal to 10% of the cumulative total of all votes cast by voters of this state for all candidates for President of the United States at the last regular general election at which a President of the United States was elected." *Id.* § 20A-7-201(2)(a).

- A person seeking to have an initiative placed on the ballot must obtain "from each of at least 26 Utah State Senate districts, legal signatures equal to 10% of the total of all votes cast in that district for all candidates for President of the United States at the last regular general election at which a President of the United States was elected." *Id.* (We refer to this below as the Senate District Requirement.)

- The sponsors must verify those signatures "by completing the verification printed on the last page of each initiative packet." *Id.* § 20A-7-205(2)(a).

- The packets must then be submitted to the county clerk for certification by "the sooner of . . . 316 days after the day on which the application is filed," or "the April 15 immediately before the next regular general election immediately after the application is filed." *Id.* § 20A-7-206(1)(a).

- The above packets must be submitted by the county clerk to the lieutenant governor on or before May 15 of the year in which the initiative is proposed to be included on the ballot. *Id.* § 20A-7-206(3).

- Those who have signed an initiative petition may have their signatures removed by "submitting to the county clerk a statement requesting that the voter's signature be removed" and providing "the name of the voter;" "the resident address at which the voter is registered to vote;" "the last four digits of the voter's Social Security number;" "the driver license or identification card number;" and "the signature of the voter." *Id.* § 20A-7-205(3)(a)–(b).

- Voters seeking to have their signatures removed have until one month after the petition in support of the initiative is filed to do so. *See id.* § 20A-7-205(3)(d).

¶5   CMV alleges that it had satisfied the above requirements as of April 15, 2018. By that date, CMV asserts that it had held the required public hearings and had gathered all of the requisite signatures in the manner prescribed by the legislature. In all, CMV claims that it gathered over 150,000 signatures in support of the Direct Primary Initiative. And CMV alleges it gathered more than enough signatures in twenty-six of the twenty-nine state senate districts.

¶6   CMV also alleges that its attempt to qualify the Direct Primary Initiative for the ballot was thwarted by the efforts of another group known as Keep My Voice. Keep My Voice organized an opposition to the Direct Primary Initiative. It sent members door-to-door in a few select state senate districts. And it apparently persuaded a number of voters to sign statements seeking to have their signatures removed from the petition—enough voters that the Direct Primary Initiative fell below the statutory threshold in three of the twenty-six districts in which CMV had gathered votes. Keep My Voice gathered the voter statements and submitted them *en masse* to the lieutenant governor. And the lieutenant governor ultimately found that the petitioners had failed to satisfy the requirements of Utah Code section 20A-7-201(2)(a) and thus refused to certify the initiative for the November 2018 ballot.

¶7   CMV challenged that decision in a petition for extraordinary writ in this court. The petition challenges the lieutenant governor's decision on both statutory and constitutional grounds. CMV contends (1) that Utah Code section 20A-7-205(3)(a) should be construed to require an individual signer to personally submit a request for removal of a signature in support of an initiative petition, and thus to foreclose the submission of such requests by a group like Keep My Voice; and (2) that the terms and conditions of Utah Code sections 20A-7-201 *et seq.* are unconstitutional under (a) the Equal Protection Clause of the United States Constitution, (b) the Uniform Operation of Laws Clause of the Utah Constitution, and (c) article VI, section 1 of the Utah Constitution.

¶8   The decision whether "to grant or deny a petition for extraordinary writ is discretionary." *Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 10, 322 P.3d 662. In exercising our discretion, we have been sensitive to the problems associated with the issuance of a decision in circumstances involving "disputed material allegations of fact" in the absence of a "record . . . to aid this court in resolving" such disputes. *Carpenter v. Riverton City*, 2004 UT 68, ¶ 4, 103 P.3d 127. "Because this court does not conduct evidentiary hearings

(except in those rare circumstances in which reference to a special master is deemed appropriate)," we have emphasized that we are "not in a position to arrive at a legal ruling that is dependent on the resolution of disputed facts." *Id.*

¶9 "[T]he determination of whether this court may adjudicate a petition is not unlike a district court's decision to grant summary judgment." *Id.* ¶ 5. "Where a petition is presented on uncontroverted material facts (e.g., by stipulation or unopposed affidavits), and it is otherwise appropriate for this court to exercise its jurisdiction to issue extraordinary relief, it may issue a judgment on the merits. Conversely, where a petitioner is unable to meet the requirement of an undisputed basis for issuing the relief requested, the petition generally should not be brought in this court in the first instance." *Id.*

## II. ANALYSIS

¶10 Several of CMV's claims raise pure questions of law. Those claims are subject to resolution on the briefing that is before us. But that is not true of all of CMV's claims. The challenge under article VI of the Utah Constitution is more fact-intensive. For that reason we are unable to resolve it conclusively on the briefing that is before us.

¶11 We deny the petition for extraordinary writ for reasons set forth below. We reject CMV's statutory claim on its merits— concluding that there is no bar in Utah Code section 20A-7-205(3)(a) to collective submission of signature removal requests. We also reject CMV's equal protection and uniform operation of laws claims on their merits. We hold that the challenged provisions of the Utah Code trigger only rational basis scrutiny under the Equal Protection Clause and uphold those provisions as rational. We also conclude that they effect no disparate treatment of similarly situated persons and accordingly hold that they raise no uniform operation of laws concerns.

¶12 We also deny the petition to the extent it is rooted in a claim under article VI of the Utah Constitution. But we decline to render a conclusive ruling on the merits of the questions presented on this claim because it implicates elements of the governing legal standard that are not fully developed in our jurisprudence and it turns on disputed questions of fact. For these reasons we decline to exercise our discretion to resolve this claim on a petition for extraordinary writ. We hold that CMV has failed to carry its burden of establishing a violation of article VI "with undisputed allegations of fact." *See Carpenter v. Riverton City*, 2004 UT 68, ¶ 10, 103 P.3d 127.

And we deny the petition on that basis without rendering a conclusive decision on the merits of this claim.

¶13   The grounds for the court's disposition of CMV's statutory claim are set forth in Part II.A. below. Part II.B. presents the basis for the court's disposition of CMV's constitutional claims. Part II.C. then concludes with a discussion of additional issues; this portion of the opinion presents the views only of the author of this majority opinion.

## A.  Statutory Claim

¶14 CMV's first claim arises under Utah Code section 20A-7-205(3)(a), the so-called "Removal Provision." CMV asks us to interpret this provision to require personal submission of the signature removal form by the voter. Such an interpretation would foreclose the need for us to address CMV's constitutional claims because the removal forms at issue were not submitted personally by voters but through Keep My Voice.

¶15   CMV asserts that its reading of the Removal Provision is required by the canon of constitutional avoidance, the plain text of the statute, the legislative history, and the overall purpose of the Election Code. CMV also contends that such a reading is supported by the official signature removal form issued by the lieutenant governor's office. We find none of these points persuasive.

¶16   We begin with the text of the statute. The governing text of the Removal Provision provides that a "voter who has signed an initiative petition may have the voter's signature removed from the petition by submitting to the county clerk a statement requesting that the voter's signature be removed." UTAH CODE § 20A-7-205(3)(a). CMV asks us to read a personal submission requirement into the statutory reference to a "voter." We decline to do so under the *expressio unius* canon—the notion that the expression of one set of terms or conditions is an implied exclusion of others. *See Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000. And we hold that the statutory text, as informed by this canon, forecloses CMV's other arguments.

¶17   The Removal Provision prescribes an express restriction on the submission of removal forms. It states that the "voter may not submit a statement by email or other electronic means." UTAH CODE § 20A-7-205(3)(c). The implication is that voters are subject to no other restrictions. They may utilize other means of submission—including by utilizing the assistance of a third party. But personal submission (without the assistance of a third party) is not required.

¶18 The statutory prohibition on *email* strongly implies approval of the regular mail. And if regular mail is allowed, then voters can surely rely on the assistance of a third party. A letter carrier is a third party, and we see no non-arbitrary basis for distinguishing the services of a letter carrier from that of an organization like Keep My Voice.[3] We accordingly hold that CMV's position fails as a matter of plain language.

¶19 That conclusion forecloses CMV's other arguments. Where the statutory language is clear we have no basis for considering the canon of constitutional avoidance, *see Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 24, 332 P.3d 900 (canon does not apply unless statute is "genuinely susceptible to two constructions" (citation omitted)), or an assertion of a general statutory "purpose" that purportedly overrides the text, *see Craig v. Provo City*, 2016 UT 40, ¶ 33, 389 P.3d 423 ("text must control over a general sense of legislative purpose").

¶20 The conclusion that CMV's view is incompatible with the plain language of the statute also obviates the need to resort to the legislative history. *See In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 15, 266 P.3d 702. This is especially so "where it is employed to credit personal preferences of individual legislators over the duly enacted statutory text." *Id.* ¶ 112 (Lee, J., concurring in part and concurring in the judgment). And that is exactly what CMV seeks to do here. CMV offers single lines from the statements of Senators Liljenquist and Stephenson and Representative Wimmer. These statements are at best ambiguous. They certainly do not provide enough justification to override the clear import of the statutory text.

¶21 CMV also seeks to find support for its position in the language of the signature removal form issued by the lieutenant governor's office. That form states that a signatory must submit the application to the "county clerk via mail or deliver it in person." 2018 Official Removal Form,

---

[3] There may well be a *factual* difference between Keep My Voice, an organization that has a vested interest in the outcome of the initiative process, and a neutral letter carrier such as the United States Postal Service. And nothing would prevent the legislature from drawing such a line if it chose to do so. But we see no basis in the text of the current statute to draw a distinction based on the interest or stake (or lack thereof) of a third party. And we decline to shoehorn such a distinction into a statute that leaves no room for it.

https://elections.utah.gov/Media/Default/2018%20Election/Forms/2018%20Request%20to%20Remove%20Petition%20Signature.pdf. This may seem to support CMV's notion of a requirement of personal delivery. But we reject that view on two grounds. First, and foremost, is the fact that the lieutenant governor's form is not law. The lieutenant governor is charged with implementing the law in this field. But his interpretation of the law is not a matter meriting deference under Utah law. We have repudiated the principle of *Chevron* deference[4] as a matter of Utah law. *See Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712. And for that reason the lieutenant governor's view of the law, reflected in the cited form, is unhelpful to CMV's position.

¶22 There is also a second problem with CMV's reliance on this form. The form, in context, does not require personal submission. The next sentence after the one CMV quotes from the form states that "[t]his form cannot be sent via electronic means (such as email)." 2018 Official Removal Form, *supra* ¶ 21. That indicates that the "deliver it in person" reference simply illustrates an acceptable method of conveying the form to the office in hard copy; it does not foreclose the use of third-party assistance in submitting the removal form. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465 ("Our task . . . is to determine the meaning of the text given the relevant context . . . .").

¶23 We reject CMV's statutory claim on these grounds. We credit the plain text of the statute and hold that the Removal Provision does not require personal submission by the voter.

### B. Constitutional Claims

¶24 CMV also asserts a range of claims under the Utah and United States Constitutions. CMV asserts that the terms and conditions of the statutory scheme violate the Uniform Operation of Laws Clause and the Initiative Provision of the Utah Constitution. And it further contends that the challenged requirements run afoul of the Equal Protection Clause of the United States Constitution. For reasons explained in detail below, we reject each of these arguments.

---

[4] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (federal agency interpretation of ambiguous language of federal statute is entitled to deference from the courts).

### 1. Equal Protection

¶25 CMV asserts that the Removal Provision, UTAH CODE § 20A-7-205(3)(a), and the Senate District Requirement, *id.* § 20A-7-201(2)(a), acting in tandem, violate the Equal Protection Clause of the Fourteenth Amendment. The equal protection claim arises under the United States Supreme Court's one-person, one-vote precedents, such as *Moore v. Ogilvie*, 394 U.S. 814 (1969), and our analysis of these cases in *Gallivan v. Walker*, 2002 UT 89, 54 P.3d 1069. But the present case is distinguishable from *Gallivan* in important respects.

¶26 The key issue in *Gallivan* was the power disparity between urban and rural voters created by the relevant statutory provisions. The *Gallivan* plurality stated that the "disparity in power between the registered voters in rural counties and the registered voters in urban counties under the multi-county signature requirement is constitutionally impermissible, and such invidious discrimination will not be constitutionally tolerated." 2002 UT 89, ¶ 80. Such a concern is wholly absent here. The current signature provision requires sponsors to gather signatures in twenty-six of Utah's twenty-nine *senate districts*. These districts, as CMV concedes, have roughly equal populations. And this equal distribution of population means that rural and urban voters are treated the same and that neither group wields disproportionate power. Thus, even assuming that application of the one-person, one-vote principle is appropriate here, there is no violation thereof. *See Libertarian Party v. Bond*, 764 F.2d 538, 544 (8th Cir. 1985) (signature gathering provision presented no constitutional concerns where "districts [were] virtually equal in population").

¶27 We reject CMV's equal protection claim on these grounds. And we conclude that the Removal Provision and the Senate District Requirement withstand such scrutiny.

### 2. Uniform Operation of Laws

¶28 Article I, section 24 of the Utah Constitution provides that "[a]ll laws of a general nature shall have uniform operation." Historically, this Uniform Operation of Laws Clause was viewed as a "requirement of consistency in application of the law to those falling within the classifications adopted by the legislature, or in other words a prohibition on special privileges or exemptions therefrom." *State v. Canton*, 2013 UT 44, ¶ 34, 308 P.3d 517. At the time of the framing of the Utah Constitution, in other words, "uniform

operation provisions were understood to be aimed not at legislative *classification* but at practical *operation*." *Id.*

¶29 "The modern formulation of uniform operation is different. It treats the requirement of uniform operation as a state-law counterpart to the federal Equal Protection Clause." *Id.* ¶ 35. Under this conception, we have applied a three-step inquiry in determining whether the classifications in a statute run afoul of the Uniform Operation of Laws Clause. *Id.* We have asked "(1) whether the statute creates any classifications; (2) whether the classifications impose any disparate treatment on persons similarly situated; and (3) if there is disparate treatment, whether the legislature had any reasonable objective that warrants the disparity." *State v. Robinson*, 2011 UT 30, ¶ 17, 254 P.3d 183 (internal quotations marks and citations omitted); *see also DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶¶ 49–50, 364 P.3d 1036.[5]

¶30 The third step of this framework is triggered only if there is both a legislative classification and disparate treatment of similarly situated persons. In the absence of either a classification or disparate

---

[5] Our past cases have not been entirely clear in our formulation of the governing test. *See, e.g.*, *State v. Mohi*, 901 P.2d 991, 997 (Utah 1995) (asserting that the test requires two-steps, but then listing three); *State v. Canton*, 2013 UT 44, ¶ 36 n.9, 308 P.3d 517 (noting that our cases "generally incorporate principles from the federal equal protection regime" while "reserving the right to depart from those standards in an appropriate case," but concluding that "our precedent to date has offered little basis or explanation for the extent of any difference between the federal equal protection guarantee and the state requirement of uniform operation," and holding that the parties in that case had not identified any basis for any difference). The *Robinson* framework, moreover, implicates some difficult questions that are not clearly answered in our case law—as to whether, for example, the "similarly situated" inquiry is properly seen as a threshold question, or better thought of as an aspect of rational basis scrutiny. Yet this is not an appropriate case in which to resolve these questions. *See infra* ¶ 52 (highlighting some unanswered questions under article VI but identifying barriers to resolving them in a case presented to us in the compressed timeframe of a petition for extraordinary writ). As *Robinson* is a prevailing statement of our law, we proceed under its approach.

treatment of similarly situated persons, the Uniform Operation of Laws Clause is not implicated—there is no further scrutiny.

¶31   At the third step of our analysis we have asked whether a statutory classification discriminates "on the basis of a 'fundamental right'"—a conclusion that triggers heightened scrutiny. *See DIRECTV*, 2015 UT 93, ¶ 50; *Lee v. Gaufin*, 867 P.2d 572, 582–83 (Utah 1993). But such scrutiny is implicated only at the third step—it is triggered only if there is a finding of disparate treatment of similarly situated persons. *See Robinson*, 2011 UT 30, ¶ 17. We proceed to the third step, in other words, only if "the statute both creates classifications and imposes disparate treatment among persons similarly situated within those classifications." *Id.*

¶32   Petitioners' claim falters at the first two steps. We have previously suggested that the governing provisions of the Utah Code "do not create any classifications" among voters who are similarly situated. *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 33, 94 P.3d 217; *see also Cook v. Bell*, 2014 UT 46, ¶ 31, 344 P.3d 634 (concluding that "neither the senatorial district requirement, nor the one-year requirement, created any classifications" among similarly situated voters, "but appl[y] equally to all Utah citizens" (citation and internal quotation marks omitted)). And we reinforce that conclusion here—rejecting petitioners' allegation of disparate treatment of similarly situated persons. On that basis we conclude that petitioners have failed to carry their burden of establishing a violation of the Uniform Operation of Laws Clause.

¶33   Petitioners challenge the Utah Code's differential treatment of initiative sponsors and initiative opponents. They note that the Code imposes certain restrictions and requirements on the former that do not extend to the latter. As petitioners indicate, initiative sponsors must hold public hearings and file an application and various reports. And sponsors face restrictions on who may gather signatures and circulate the petition. UTAH CODE §§ 20A-7-202, 20A-7-205.5, 20A-11-802(1). None of these restrictions apply to initiative opponents. So there is disparate treatment in some sense under the *Robinson* test.

¶34   But disparate treatment alone is insufficient to trigger uniform operation scrutiny under *Robinson*. The constitutional prohibition is against disparate treatment of persons who are "similarly situated." *Robinson*, 2011 UT 30, ¶ 17. And initiative sponsors and opponents are not similarly situated. Initiative sponsors are seeking a significant change to the status quo—the addition of a piece of proposed legislation to the ballot. By proposing

an initiative, moreover, sponsors are introducing a new topic for evaluation by voters. Opponents are in a different position altogether. They do not wish to alter Utah law, but to maintain the status quo. And they are simply responding to a topic already introduced into the public sphere by the sponsors.

¶35 These distinctions provide ample grounds for the conclusion that sponsors and opponents are not similarly situated. The legislature could properly conclude that those who seek to maintain the status quo—and to respond to a subject introduced by proponents—need not be subject to the restrictions placed on those who open up the subject for consideration in the first place. These are rational grounds for distinguishing sponsors from opponents. And the existence of a legitimate ground that "can be reasonably imputed to the legislative body" is enough to justify the legislative distinction. *See Safe to Learn*, 2004 UT 32, ¶ 36.

¶36 In a sense the petitioners' core complaint is that the legislature has not swept more broadly in its attempt to regulate the initiative process. The concern is with the legislature's failure to regulate more extensively than it did—its decision to impose qualification requirements only on initiative sponsors, without imposing parallel requirements on opponents. But that is "not a viable, standalone basis for a uniform operation challenge." *Canton*, 2013 UT 44, ¶ 39. Because sponsors and opponents are not similarly situated, the legislature is not required to treat them identically. And the fact that the legislature could have extended its regulations to initiative opponents is no basis for striking down this legislation on uniform operation grounds.

¶37 Petitioners also seek to direct their uniform operation challenge at Utah Code sections 20A-7-205(3)(a)–(b) and 20A-7-201(2)(a). The first-cited provision allows voters who have once signed a petition to remove their support for an initiative by filing a statement with a signature and identifying information. The second provision requires sufficient signatures (10 percent of the votes for President in the last presidential election) not just statewide but in twenty-six of twenty-nine state senate districts. And petitioners assert that the effect of these provisions is to "dilute" the power of those who sign a petition and choose not to remove their signatures and "heighten" the power of those who do.

¶38 This claim, at bottom, seems rooted not in an allegation of disparate treatment but in principles established in article VI of the Utah Constitution. The allegations about dilution of support for an initiative and heightened effects of opponents' rights sounds in

principles of "undue burden" on the initiative right. And that is a concern addressed by the test we have formulated under article VI, which we evaluate in Part II.C. below.

¶39　The treatment of supporters and opponents of an initiative, in any event, are again explained by the fact that these two groups are not similarly situated. Voters who wish to remove their signatures are in a qualitatively different position from both voters who have signed a petition but still maintain their support, and voters who have not yet signed (and may never do so). Voters who wish to remove their signatures are seeking to change their minds about a political issue; yet the fact that they previously signed means that they are at least tentatively committed to their previous position. Voters who have not yet signed, on the other hand, are free to change their minds at any time. And voters who have signed and wish to maintain their support face no problems at all.

¶40　Thus, those who wish to remove their signatures must clear a higher bar in order to effectuate their change of opinion. But those voters are not similarly situated with other groups of voters. And the legislature thus has a rational basis for prescribing a process by which voters can avail themselves of that right.[6]

---

[6] Petitioners assert that the legislature's elimination of the notarization requirement makes it much easier for voters to withdraw their support for an initiative—so easy, in fact, that the right to an initiative is unconstitutionally "diluted." Our precedent, however, has long recognized an individual right of a voter to withdraw support for an initiative. *See Halgren v. Welling*, 63 P.2d 550, 557 (Utah 1936). And the precise means of balancing the proper protection of that right against the rights of those voters who wish to support an initiative is not ours to make. All that is required is that the legislative line-drawing is rational. And the lines drawn here surely are. *See* UTAH CODE § 20A-7-205(3)(a)–(d) (providing safeguards against fraud by requiring a voter seeking to withdraw support to provide name, address, last four digits of the social security number, driver's license number, and signature). For that reason we are in no position to second-guess the legislature's judgments in this field. *See Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 427 (Utah 1995) (exact proof of legislative purposes is not required, as long as reasonably conceivable facts support the provision).

¶41   We reject petitioners' uniform operation claim on this basis. Because petitioners have identified no disparate treatment of similarly situated persons, we hold there is no uniform operation violation.

### 3.  Article VI

¶42   Article VI, section 1 of the Utah Constitution provides in relevant part as follows:

> The legal voters of the State of Utah, in the numbers, under the conditions, in the manner, and within the time provided by statute, may[] initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute.

UTAH CONST. art. VI, § 1(2)(a). Our precedents have highlighted two central features of this provision. On one hand, we have held that article VI, section 1 establishes a right of "legal voters" to "initiate" desired legislation and "cause it to be submitted to the people" for a vote. *Id.*; *see also Gallivan*, 2002 UT 89, ¶ 25 (concluding that the initiative right is a "constitutionally guaranteed right"); *Safe to Learn*, 2004 UT 32, ¶ 27 (reinforcing that conclusion). With this in mind, we have concluded that the legislature "is required to 'enact legislation to enable the people to exercise their reserved power and right to directly legislate through initiative.'" *Safe to Learn*, 2004 UT 32, ¶ 28 (quoting *Gallivan*, 2002 UT 89, ¶ 28). And we have subjected legislative restrictions on the right to initiate legislation to a degree of constitutional scrutiny. *See, e.g., Cook*, 2014 UT 46.

¶43   On the other hand, we have also noted that the rights of voters in this field are "not unfettered, but come[] with a built-in limitation." *Safe to Learn*, 2004 UT 32, ¶ 28. Thus, we have explained that article VI, section 1, "while granting the right" to initiate legislation, "simultaneously circumscribes that right by granting the legislature leave to regulate, by statute, the manner in which the right is exercised." *Id.* And we have held that the qualified or "self-limiting" nature of the initiative rights of the people means that legislative restrictions in this field are "not . . . subjected to heightened scrutiny," but instead are subject to review under a standard that recognizes "'the conclusion that government must play an active role in structuring elections.'" *Id.* ¶ 34 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).

¶44   With this in mind, we have "reiterate[d] that '[i]t is axiomatic that laws enacted by the legislature are presumed to be

constitutional and that the legislature is accorded wide latitude in complying with constitutional directives such as the one contained in article VI, section 1." *Id.* ¶ 35 (second alteration in original) (quoting *Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994)). And we have articulated an "undue burden" test aimed at respecting both the rights of voters to initiate legislation and the prerogatives of the legislature to regulate the terms and conditions of the exercise of that right. That test states that a court should assess whether a legislative "enactment is reasonable, whether it has a legitimate legislative purpose, and whether the enactment reasonably tends to further that legislative purpose." *Id.* And in "evaluating the reasonableness of the challenged enactment and its relation to the legislative purpose," we have said that "courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose." *Id.*

¶45   Our precedents thus call for the court to weigh or balance the two components of article VI, section 1—the voters' right to initiate legislation, and the "built-in limitation" on that right (in the legislature's expressly delegated power to prescribe terms and conditions on its exercise). In assessing the strength of the latter (legislative purpose), we have emphasized that "'we do not require exact proof of the legislative purposes; it is enough if a legitimate purpose can be reasonably imputed to the legislative body.'" *Id.* ¶ 36 (quoting *Ryan*, 903 P.2d at 427). We have also said that the standard "'does not purport to require the [l]egislature to find the least restrictive manner of furthering its purpose,'" but also "does not allow 'such wide latitude as to virtually abandon judicial review.'" *Id.* ¶ 37 (alteration in original) (quoting *Condemarin v. Univ. Hosp.*, 775 P.2d 348, 373 (Utah 1989) (Stewart, J., concurring in part)). Thus, we have said that this inquiry "bear[s] a resemblance to our traditional minimal scrutiny review" but requires a somewhat "more exacting analysis." *Id.*

¶46   Our cases have not identified all of the senses in which article VI scrutiny is "more exacting" than that called for under rational basis review. The test as formulated in our case law does state that one additional element of the article VI test concerns an inquiry into the degree of any alleged burden on the initiative right—the "extent to which the right of initiative is burdened." *Id.* ¶ 35. But we have not yet had occasion to specify the manner and means by which a party may carry its burden of establishing the nature and extent of any burden on the initiative right. Nor have we had the opportunity to explain exactly how the degree of any such

burden is to be balanced or weighed "against the importance of the legislative purpose" of the statutory provisions in question. *Id.*

¶47 This is a matter of great significance under the Utah Constitution. Different members of this court, moreover, may have differing views on how best to frame this element of the test.[7] And the parties' briefing in this matter has not proposed a basis for clarifying or illuminating the as-yet unspecified terms of our test.[8]

---

[7] *See Cook*, 2014 UT 46, ¶ 22 (noting that the plaintiff in that case had presented "no evidence that the initiative proponents' failure . . . signifies that *no* unsponsored and volunteer-driven petition would be able to succeed"); *id.* ¶ 39 (Lee, J., concurring in the judgment) (suggesting that the legislature's right to define the terms and conditions of initiatives should "yield to the right of the people to initiate desired legislation in circumstances where the legislature's regulation forecloses any meaningful channels for the actual vindication of the people's reserved power"); *id.* ¶ 42 (suggesting that we should override a legislative prescription of the terms and conditions of initiatives "only in the rare circumstance in which the legislature's attempts to regulate *process* effectively abrogate the reserved right of the people to initiate desired legislation"); *see also supra* ¶ 37; *infra* ¶¶ 110–31.

[8] The question also arose at oral argument. There the court asked all counsel for further input on the nature and extent of the proof required to establish a "burden" on the initiative right, and on how to decide when that burden becomes "undue" (in outweighing the strength of the legislative purpose). Oral Argument, *Count My Vote v. Cox* (Aug. 14, 2018) (https://www.youtube.com/watch?v=wlfRGoWHLfQ). And counsel offered little, if anything, more than what was provided in the briefs—a restatement, for the most part, of what appears in our case law in this area, and an assurance that the court will somehow "know it when we see it." *Id.*

The dissent's approach is similarly opaque. Justice Petersen says that it is "clear" that the burden caused by the election code is "undue." *Infra* ¶ 127. And she advances the sweeping conclusion that the government's interests are insufficiently "important" to outweigh that burden. *Infra* ¶ 127. Yet nowhere does the dissent describe the precise standards that it would apply in defining what qualifies as an "undue" burden or in balancing that burden against the competing legislative purpose. Without more, the dissent's

(continued . . .)

¶48 This is perhaps understandable given the compressed timeframe in which this case comes before us on this petition for extraordinary writ. In light of the inherent time pressures involved in a case that must be decided before the upcoming November election, we can understand the difficulty of providing careful briefing on all of the ins-and-outs of the "undue burden" test as applied to a case like this one. We recognize, moreover, that it is the duty and prerogative of this court to say what the law is. And in a case before us on appeal, we typically would take whatever steps necessary to clarify and specify the standard of proof that applies to a claim presented for our decision.

¶49 This case is not before us on appeal, however. It is presented on a petition for extraordinary writ—in which we have discretion to decide *not to decide* the issues presented on their merits. *Carpenter v. Riverton City*, 2004 UT 68, ¶ 5, 103 P.3d 127 (emphasis added) (noting that we "*may* issue a judgment on the merits"). And the imprecision in the operative standard is not the only problem. There is another key shortcoming in the case as presented to us in this procedural posture: Because the case was filed here in the first instance, there is no evidentiary record; and the parties' submissions reveal an underlying dispute on the nature and extent of any burden on the right to pursue an initiative.

¶50 Petitioners' "proof" of the burden on their right to propose an initiative is anecdotal. They have not submitted any expert testimony or statistical evidence of the impact of the challenged statutory provisions on their ability to succeed in getting an initiative on the ballot. Instead they note that their Direct Primary Initiative failed to qualify for the ballot despite its alleged popularity among voters. And they assert that two other groups initiated attempts to get statewide initiatives on the ballot but failed. On this basis, petitioners invite us to make the "common sense" conclusion that the legislature's restrictions on ballot initiatives have gone too far— and impose a burden on ballot initiatives that is "undue" and should be deemed to outweigh the strength of any legitimate legislative purpose in regulating the terms and conditions of the initiative process.

---

approach only highlights the need for us to identify a clear standard before we resolve a case of this significance. And for reasons explained herein, we conclude that this is not the right case in which to do so.

¶51 The lieutenant governor proffers a different view. In the lieutenant governor's view the "undue burden" standard cannot be met upon a mere showing that petitioners' "initiative failed to reach the ballot." Lieutenant Governor's Memorandum in Opposition to Petition for Extraordinary Writ at 21. The lieutenant governor asserts that "three other statewide initiatives qualified for the ballot this year—under the same legal requirements" challenged by petitioners. *Id.* at 22, 22 n.3 (alleging that "[o]nly four initiative proponents sought approval for their initiatives to be on the ballot" and that "[o]f those four," the Direct Primary Initiative "is the only one that failed to qualify"). And he insists that "a threshold that 75 percent of initiative sponsors cleared this year cannot fairly be called unduly burdensome." *Id.* at 22. Citing *Cook v. Bell*, the lieutenant governor asks us to reject petitioners' article VI argument on the ground that petitioners failed to present "practical," "real-world evidence" that the statutory provisions in question actually burdened petitioners' attempts to get their Direct Primary Initiative on the ballot. *Id.* at 23 (citing *Cook* to the extent the majority in that case noted "that there was 'no evidence that the initiative proponents' failure . . . signifies that *no* unsponsored and volunteer-driven petition would be able to succeed").

¶52 These arguments and assertions leave us with a range of unanswered questions about the material facts of this case. Without more briefing, and in the absence of a record and decision by a lower court, we are in no position to resolve the dispute between petitioners and the lieutenant governor. We cannot determine, for example, whether or to what extent the challenged statutory provisions resulted in an undue burden on the right to initiative.[9]

---

[9] The dissent's contrary conclusion is rooted in an oversimplification of the question presented. We do not doubt that CMV obtained sufficient signatures prior to the removal period but dropped below the statutory minimum thereafter. *See infra* ¶¶ 118–20. In a but-for sense, it may thus be said that it was the removal period that "led to" the failure of the Direct Primary Initiative. *Infra* ¶ 118. But that is not the question under our case law. There is no constitutional bar to statutory provisions that happen to stand in the way of an individual initiative in a particular election year. The constitutional question is whether the statutory provision in question caused an "undue burden" on the "right of initiative." *Safe to Learn*, 2004 UT 32, ¶ 35. Again, our cases have not stated the standard for

(continued . . .)

Nor can we assess whether or to what extent the differences between the parties in their view of the alleged facts may be material to the question presented. Yet there is no time for us to seek supplemental briefing in a case that must be resolved so quickly—in advance of the November election. And we are in no position, on this record and with the briefing now before us, to decide whether any alleged impact on the voters' right to an initiative is outweighed by the importance of the legislature's legitimate purposes in enacting the provisions in question.

¶53 For these reasons we conclude that petitioners have failed to carry their burden of identifying "an undisputed basis for [granting] the relief requested," as required in our case law. *See Carpenter*, 2004 UT 68, ¶ 5. And we deny the petition on this basis without reaching the merits of petitioners' claim under article VI.

---

the undue burden inquiry with any degree of precision. But we have made clear that it is not enough for a party to assert that its initiative efforts in a given election year were interrupted by a challenged statutory provision. *See Cook v. Bell*, 2014 UT 46, ¶ 10, 344 P.3d 634 (alterations in original) (citation omitted) ("[t]his does not mean . . . that the legislature may never pass regulations that have the effect of making it more difficult to enact legislation by initiative"); *Safe to Learn*, 2004 UT 32, ¶ 49 ("Although we recognize the potential difficulty this provision may cause to initiative sponsors, such a regulation is reasonable in light of the importance of protecting the right of a voter to withdraw his signature . . . ."). More is required, and the *more* involves a broader inquiry into the global effect of a challenged statutory provision on access to the ballot of initiatives more generally. *See Cook*, 2014 UT 46, ¶ 12 (speaking in terms of "unduly burden[ing] the right of *Utah's citizens* to initiate legislation" (emphasis added)). Justice Petersen has not addressed this question, and again we have neither the record nor the briefing necessary to resolve it.

On this record we cannot determine whether the Direct Primary Initiative's failure is an indication of an undue burden on the initiative right more generally or a lack of sufficient support for this particular initiative. Again, other initiatives have succeeded under this statutory scheme. *Infra* ¶ 126 (noting the success of the cannabis initiative). And it may be that the facts cited by the dissent are only an indication that the Direct Primary Initiative was not as popular as those that succeeded in getting on the ballot—and not proof of an undue burden on the "right of initiative."

¶54   In so doing we do not foreclose the possibility that these petitioners or other claimants may be able to carry their burden in a future case. Our disposition of this matter is based on the procedural posture of the case that is before us—the fact that this comes to us in a compressed timeframe on a petition for extraordinary writ.[10] And we note that our decision could conceivably be different if a case like this came to us on a more completely developed record—in a case filed in district court on a declaratory judgment claim, for example.

¶55   Some of the questions presented here are arguably resolved by our precedent. But petitioners have sought to distinguish or overcome that precedent—by asserting, for example, that the net effect of the range of statutory provisions they challenge here is sufficiently greater than that at issue in our prior cases, such as *Safe to Learn*, to allow them to satisfy the undue burden test. We do not foreclose that possibility. But we emphasize that this is not an appropriate posture in which to resolve this question.

### C.  Unresolved Issues

¶56   In the above sections we set forth appropriate grounds for the denial of the petition filed with the court in this case. Yet we also identified some important issues that we do not resolve conclusively. Those issues concern the governing standard of scrutiny under article VI, section 1 of the Utah Constitution, and the applicability of the heightened scrutiny standard set forth in the one-person, one-vote cases under the Equal Protection Clause of the United States Constitution. These are important questions on which our law is in a state of disarray. We should resolve them in a future case in which the issues are more squarely presented.

#### 1.  The Undue Burden Test Under Article VI, Section 1

¶57   A key question presented here concerns the governing standard of scrutiny under article VI, section 1 of the Utah Constitution. We sidestep this question above, citing a series of unresolved factual questions and shortcomings of the parties' briefing. *See supra* ¶ 52. That is an appropriate disposition given the

---

[10] In that sense this case is different from the other cases in which we have applied the undue burden test under article VI. Both *Safe to Learn* and *Cook* came to us in the ordinary course—as appeals from cases heard first in the district court. *See Cook*, 2014 UT 46, ¶ 6; *Safe to Learn*, 2004 UT 32, ¶ 8.

discretionary nature of a petition for extraordinary writ. But in time we will need to address this important question.

¶58   Our case law is in a state of disarray on this issue. We have articulated an "undue burden" test with a range of factors to be balanced by the court. *See Utah Safe to Learn-Safe To Worship Coal., Inc. v. State*, 2004 UT 32 ¶ 35, 94 P.3d 217. But we have not yet settled on a consensus understanding of how that test is supposed to function, or of whether it is a workable or correct one. That is highlighted by the various opinions of the members of the court on this issue here. *See infra* ¶¶ 79–138. In time we will need to confront this problem.

¶59   When we reach this question we will need to clarify, at a minimum, how the undue burden test is supposed to work in practice. And when we do, we should consider whether the test as stated is a workable one, and whether it can be reconciled with the language and structure of the Utah Constitution. *See Cook v. Bell*, 2014 UT 46, ¶ 38, 344 P.3d 634 (Lee, J., concurring in the judgment).

¶60   The right to an initiative is a carefully circumscribed one. There is no freestanding, unfettered right to initiate legislation. The right established in the Utah Constitution is expressly defined as a right to initiate legislation "in the numbers, under the conditions, in the manner, and within the time provided by statute." UTAH CONST. art. VI, § 1. The structure of this provision is significant. It identifies the branch of our government that is tasked with the balancing and policymaking inherent in deciding on the terms and conditions of the initiative power. That branch is the legislature; not the judiciary.

¶61   The "undue burden" standard articulated in our cases calls on us to "(a) assess the extent of any 'undue burden' imposed by the legislature's regulation of the initiative process, (b) evaluate whether any legislative regulation is 'reasonable' or 'reasonably' advances a legislative purpose, [and] (c) 'weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose.'" *Cook*, 2014 UT 46, ¶ 41 (Lee, J., concurring in the judgment). It seems difficult, at best, for our courts to seize this balancing power without treading on the express authority of the legislature to determine the "numbers," "conditions," "manner," and "time" for the exercise of the initiative power.

¶62   The briefing in this case has highlighted problems with the workability of the "undue burden" balancing test. CMV has urged us to second-guess the balance struck by the legislature in regulating access to the ballot. But nowhere has it described a workable basis for us to discern when the legislature's regulation is appropriately

"reasonable" or whether the burden on the initiative right is outweighed by "the importance of the legislative purpose." *Id.* The reasonableness inquiry is a matter committed to the legislature in the first instance. And our cases have never identified a standard for a judicial assessment of reasonableness.

¶63   The nature of the weighing of the burden on the initiative right against the "importance" of legislative purpose is also a matter undefined by our cases. This balance, moreover, is a battle of incommensurables. It is not at all clear what it would mean for a burden on the initiative right to be outweighed by the "importance" of a legislative purpose. We have never explained how this weighing is supposed to work. At its core, it seems to be nothing more than a reservation of a judicial right to second-guess the lines drawn by the legislature—a significant problem under a constitutional provision that guarantees a right *as limited* by the terms and conditions prescribed by the legislature. In any event the parties have offered no workable structure for the application of this balancing test.

¶64   In time we will need to confront this problem. When we do, I would not think we would be "duty-bound" to restate and apply the undue burden standard as currently framed in our cases. *See infra* ¶ 80. Our decisions in this field will certainly trigger the doctrine of *stare decisis*. But that doctrine leaves room for us to clarify and reformulate the standards set forth in our past decisions, particularly where they are viewed as unworkable. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 40, 345 P.3d 553 (noting that unworkability of the applicable legal principle lessens the deference granted to precedents).

¶65   And the undue burden framework is the very model of unworkability. We cannot possibly apply it without clarifying and extending it. *See supra* ¶ 47 n.8 (noting the petitioners' inability to identify a basis for establishing that a burden is "undue" or for balancing the incommensurable elements of the existing test, and indicating that counsel urged us to fall back on the notion that we'll "know it when we see it"). Because we clearly have work to do in explaining the governing standard, we should open the door to doing so in a future case.

¶66   We should welcome briefing on the correct standard to apply under article VI, section 1. One possibility would be a test calling for deference to legislative regulation of the initiative process "except in circumstances where such regulation forecloses any meaningful possibility for the people to exercise the [initiative] power." *Cook*, 2014 UT 46, ¶ 39 (Lee, J., concurring in the judgment) (emphasis omitted). Such a test could allow us to respect both the

constitutional right to "initiate" "desired legislation" and the fact that the right is expressly defined as a right as limited by "conditions" adopted by the legislature. UTAH CONST. art. VI, § 1. Yet even this test would require further clarification going forward. For it to guide our decisions we would need to elaborate on what it means for legislative restrictions to foreclose a "meaningful possibility" of the exercise of the initiative power.

¶67 We need not resolve this question here. But there is a crucial need for us to revisit and clarify the standards set forth in our cases in the near future.[11]

### 2. The Applicability of Heightened Scrutiny Under the One-Person, One-Vote Line of Cases

¶68 CMV's invocation of the one-person, one-vote analysis in *Gallivan v. Walker*, 2002 UT 89, 54 P.3d 1069, fails for reasons explained in Part II.B.1. above. As we explain there, the concern that formed the basis of our decision in *Gallivan* "is wholly absent here" given that Utah's senate districts "have roughly equal populations." *Supra* ¶ 26. This is an adequate basis for distinguishing *Gallivan*, and

---

[11] We should also welcome briefing on a related question raised by Justice Himonas—whether it makes sense to apply a deferential standard of scrutiny under article VI, section 1 if we uphold a standard of heightened scrutiny under the Uniform Operation of Laws Clause. *See infra* ¶ 93. Justice Himonas raises an interesting question. The initiative right is surely "fundamental" in the sense that it is recognized in an express provision of the Utah Constitution. Yet the extent of the fundamentality of this right is defined and circumscribed by the terms of article VI, section 1. And those terms speak quite specifically to the governing standard of scrutiny—in emphasizing the prerogative of the legislature to regulate the terms and conditions of the exercise of the initiative right. That suggests a different way to resolve the tension identified by Justice Himonas— rather than applying heightened scrutiny under the uniform operation clause we could conclude that the standard of scrutiny is dictated by the provision of the constitution that speaks most specifically to the role of the legislature in this important field.

I make this observation not to prejudge the answer to this important question. Again I will keep an open mind as the issue arises in a future case. But I do think it important to highlight this issue in a manner that may facilitate careful briefing going forward.

an appropriate ground for rejecting the equal protection claim set forth in the CMV petition. The briefing in this case, however, has also highlighted another problem with the petitioners' reliance on *Gallivan*. And in my view this problem merits our attention in a future case.

¶69   The problem goes to the standard of scrutiny that applies under the Equal Protection Clause in a case like this one. In *Gallivan* a plurality of this court endorsed a strict scrutiny standard arising from the one-person, one-vote line of precedent from the United States Supreme Court. Specifically, the *Gallivan* plurality invoked *Moore v. Ogilvie*, 394 U.S. 814 (1969) in support of a "fundamental" right to vote for an initiative, and thus a strict standard of scrutiny for laws impinging on that right. 2002 UT 89, ¶ 26.

¶70   The *Moore* case considered an Illinois initiative procedure by which independent candidates could get on the ballot. Illinois required prospective candidates to gather 200 signatures from qualified voters in 50 of the 102 counties in the state. 394 U.S. at 815, 818–19. Reasoning that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society," the *Moore* Court held that "[a]ll procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote." *Id.* at 818 (citation omitted). Under this standard, the Court struck down the Illinois scheme because it "applie[d] a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional theme of equality among citizens in the exercise of their political rights." *Id.* at 818–19.

¶71   The *Gallivan* plurality would have invalidated Utah's initiative procedures on these same grounds. Our Utah procedures required initiative sponsors to obtain signatures in twenty of Utah's twenty-nine counties. The *Gallivan* plurality stated that the "disparity in power between the registered voters in rural counties and the registered voters in urban counties under the multi-county signature requirement is constitutionally impermissible, and such invidious discrimination will not be constitutionally tolerated." *Gallivan*, 2002 UT 89, ¶ 80. And the plurality would have invalidated the signature requirement under heightened scrutiny on this basis. *Id.*

¶72   This federal basis of the *Gallivan* plurality was unnecessary to our ultimate disposition of the case. A majority based the decision on independent and adequate state grounds. *Id.* ¶¶ 34–64. The

federal one-person, one-vote analysis in *Gallivan*, moreover, represents an extension of *Moore* that seems problematic.

¶73   *Moore*, as noted, involved a petition process to put candidates on the ballot—it did not involve a direct ballot initiative. And the *Gallivan* plurality reasoned that the "only difference between [these cases] is that the first involves a person and the second involves an idea." *Gallivan*, 2002 UT 89, ¶ 77. Thus, without further analysis, the plurality said that "[t]he voters' suffrage right is fundamental and not to be infringed, regardless of whether the voters are voting for candidates or initiatives." *Id.* That does not follow from *Moore*, however.

¶74   *Moore*'s reasoning rests on the importance of voting for candidates in a representative democracy. The *Moore* Court specifically observed that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society." 394 U.S. at 818 (citation omitted). This suggests that it is *representation* that is fundamental to the democratic processes of both Utah and the United States.

¶75   Direct voting on ballot initiatives is at least arguably distinguishable. This is more reminiscent of direct democracy. And that is not the system emplaced by the United States Constitution. *See* THE FEDERALIST No. 10 (James Madison) (distinguishing our republic from a "pure democracy"); *see also Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) ("[N]othing in the language of the Constitution commands direct democracy . . . .").

¶76   The one-person, one-vote principle seems limited to the actual process of voting for candidates—and to initiatives that seek to place candidates on the ballot so they can be voted on in the future. *See Mass. Pub. Interest Research Grp. v. Sec'y of Com.*, 375 N.E.2d 1175, 1182 (Mass. 1978) (strict scrutiny not merited where issue of representation is not involved). Direct ballot initiatives, while no doubt an important aspect of governance under Utah law, likely do not occupy the same hallowed ground. As a purely state-created right, ballot initiatives may not qualify as "fundamental" for purposes of federal equal protection analysis. *Todd*, 279 F.3d at 1211 ("[I]nitiatives are state-created rights and are therefore not guaranteed by the U.S. Constitution."). And if ballot initiatives are not "fundamental" under the Equal Protection Clause, then legislation regulating initiatives would be subject only to rational basis review.

¶77 This is an open question. No binding federal precedent resolves the matter, and the *Gallivan* analysis appears only in a plurality opinion. We should decide this question in an appropriate case in the future. We should determine whether statutes regulating ballot initiatives are subject to heightened scrutiny under *Moore* or instead are subject only to rational basis review.

## III. CONCLUSION

¶78 We deny CMV's petition on the above grounds. We reject CMV's statutory claim on its merits. We also reject several of CMV's constitutional claims on the merits. We stop short of resolving one of these claims, however, on the ground that it implicates an underlying dispute of material fact on the nature and extent of any burden on the right to pursue an initiative under article VI, section 1 of the Utah Constitution. But we nonetheless deny the petition on the ground that CMV has failed to carry its burden of identifying an undisputed basis for the relief requested.

---

JUSTICE HIMONAS, concurring:

¶79 I concur in the opinion of the court, except for Part II.C. I write separately for two reasons, both of which relate to petitioners' article VI, section 1 claim. *See supra* ¶¶ 42–55. First, I write to highlight that, in my view, this court's opinion in *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, 94 P.3d 217—an opinion petitioners haven't asked us to overturn—is controlling and essentially dictates this outcome. And second, I write to express my concerns regarding that opinion's formulation of the standard of review when conducting an article VI, section 1 analysis.

¶80 Petitioners take the position that the signature removal provision of the election code places an undue burden on the right to initiative and thereby violates article VI, section 1 of the Utah Constitution. Lamentably for petitioners, this court already upheld a similar version of the signature removal provision in *Safe to Learn*, 2004 UT 32, ¶¶ 44–49. Not so fast, petitioners argue: the removal provision at issue in *Safe to Learn* was different enough from the current removal provision to render *Safe to Learn* nonbinding. The old removal provision, they point out, required voters seeking removal of their signature to submit a notarized statement to that effect to the county clerk, but the current removal provision eschews the notarization requirement and instead requires voters to submit five pieces of personally identifiable information to the county clerk along with their request for removal. In my view, however, the replacement of the notarization requirement with the personally

identifiable information requirement hasn't changed the removal provision in a way that would preclude *Safe to Learn*'s holding from applying here.[12] Therefore, having concluded that *Safe to Learn* provides the controlling standard for our review of petitioners' article VI, section 1 claim, I'm duty-bound to accede to the majority's opinion. That's not to say that I'm fully on board with the *Safe to Learn* standard. I'm not. I outline my misgivings below.[13]

¶81   Utah's constitution was amended in 1900 to include the people's right to initiative. *Carter v. Lehi City*, 2012 UT 2, ¶ 23, 269 P.3d 141; *see generally* UTAH CONST. art. VI, § 1. The right to initiative embodies the principle that the people should have the opportunity to govern themselves, "unfettered by the distortions of representative legislatures." *Carter*, 2012 UT 2, ¶ 23; *see also Gallivan v. Walker*, 2002 UT 89, ¶ 25, 54 P.3d 1069 ("[The right to initiative] is democracy in its most direct and quintessential form."). Functionally, the initiative process acts as the people's check on the legislature's otherwise exclusive power to legislate.

¶82   Recognizing the importance of the people's power to legislate, this court has held that the people's "reserved right and power of initiative is a fundamental right under article VI, section 1 of the Utah Constitution." *Gallivan*, 2002 UT 89, ¶ 24. Analogous to the right to vote generally, the right to initiative "guarantees participation in the political process" and "form[s] an implicit part of the life of a free citizen in a free society." *Id.* ¶ 25 (alteration in original) (citation omitted). Indeed, because the right to initiative is "sacrosanct and a fundamental right, Utah courts must defend it against encroachment and maintain it inviolate." *Id.* ¶ 27.

---

[12]   In 2019, after we heard oral argument in this case and issued an order denying the petition, the legislature amended the signature removal provision yet again. The new provision requires fewer pieces of personally identifiable information. *See* UTAH CODE § 20A-7-205(3)(a). In my view, this amendment, like the one addressed by petitioners, hasn't changed the provision in a way that would preclude the application of *Safe to Learn*'s holding to it.

[13] I recognize, of course, that the opinion of the court doesn't necessarily foreclose petitioners' article VI, section 1 claim as we've decided not to reach the merits of the claim. *See supra* ¶¶ 53–54. But this determination is driven by the *Safe to Learn* standard.

¶83   Utah courts and courts across the country overwhelmingly employ strict or heightened scrutiny review when evaluating legislative enactments that implicate fundamental rights. *Infra* ¶¶ 84–86. This practice holds true regardless of the substance of the fundamental right involved or nature of the challenge brought. *Id.*

¶84   Courts apply strict or heightened scrutiny in cases involving fundamental rights sounding in due process. *See, e.g., Jones v. Jones*, 2015 UT 84, ¶ 22, 359 P.3d 603 (noting that strict scrutiny applies in cases involving a "fundamental right of a parent to regulate the visitation of a child" (internal quotation marks omitted)); *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶¶ 71–73, 250 P.3d 465 (recognizing that "a parent has a due process right . . . to maintain parental ties to his or her child" and that "[a] statute that infringes upon this 'fundamental' right is subject to heightened scrutiny" (citation omitted)); *see also, e.g., Simpson v. Miller*, 387 P.3d 1270, 1276–80 (Ariz. 2017) (applying heightened scrutiny to statutory prohibition on bail for certain sexual offenses); *Planned Parenthood of the Heartland v. Reynolds ex rel. State*, 915 N.W.2d 206, 237–41 (Iowa 2018) (applying strict scrutiny to a statute that imposed mandatory waiting period on women seeking to terminate a pregnancy).

¶85   Courts likewise apply strict or heightened scrutiny in cases involving fundamental rights grounded in equal protection or the uniform operation of laws. *See, e.g., Gallivan*, 2002 UT 89, ¶¶ 42–43 (applying heightened scrutiny to legislation affecting the fundamental right to initiative); *Dodge v. Evans*, 716 P.2d 270, 273 (Utah 1985) (applying strict scrutiny to statutory voting residency requirements that affected citizens' fundamental right to vote); *see also, e.g., In re D.W.*, 827 N.E.2d 466, 482 (Ill. 2005) ("[S]tatutory classifications that affect a fundamental right violate the equal protection clause unless they are narrowly tailored to serve a compelling state interest."); *Rodriguez v. Brand W. Dairy*, 378 P.3d 13, 24 (N.M. 2016) ("[S]trict scrutiny applies when a law draws suspect classifications or impacts fundamental rights." (citation omitted) (internal quotation marks omitted)).

¶86   And finally, courts apply strict or heightened scrutiny in cases involving plain constitutional challenges to legislation affecting fundamental rights—that is, cases in which neither due process nor equal protection is implicated by the legislative enactment. *See, e.g., State v. J.P.*, 907 So.2d 1101, 1109–16 (Fla. 2004) (applying strict scrutiny to juvenile curfew ordinances based on Florida Constitution's enumerated right to privacy and right of freedom of movement); *Tully v. Edgar*, 664 N.E.2d 43, 47–48 (Ill. 1996) ("Where challenged legislation implicates a fundamental constitutional right

. . . such as the right to vote, the presumption of constitutionality is lessened and a far more demanding scrutiny is required. When the means used by a legislature . . . impinge upon a fundamental right, the court will examine the statute under the strict scrutiny standard." (citation omitted)); *State v. Merritt*, 467 S.W.3d 808, 812–13 (Mo. 2015) (per curiam) (applying strict scrutiny to felon-in-possession law based on Missouri Constitution's right to bear arms provision).

¶87 However, in deciding how to evaluate legislative restrictions on the fundamental right to initiative, the *Safe to Learn* court chose to announce a standard of review that stops far short of strict or heightened scrutiny.

¶88 The *Safe to Learn* standard reflects an attempt to reconcile the status of the right to initiative as a fundamental right with article VI, section 1's directive to the legislature to prescribe the "numbers," "conditions," "manner," and "time" in which the right to initiative can be exercised. UTAH CONST. art. VI, § 1(2)(a). In doing so, this court held that article VI, section 1 claims should be analyzed by "assess[ing] whether the [legislative] enactment is reasonable, whether it has a legitimate legislative purpose, and whether [it] reasonably tends to further that legislative purpose." *Safe to Learn*, 2004 UT 32, ¶ 35. To evaluate reasonableness in this context, "courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose." *Id.* By its own admission, the *Safe to Learn* court describes this standard of review as "bearing a resemblance to our traditional minimal scrutiny review." *Id.* ¶ 37.

¶89 In declining to apply strict or heightened scrutiny to article VI, section 1 claims, this court has repeatedly cited the language of article VI, section 1 as the reason for employing a standard that lands closer to traditional minimum scrutiny than strict or heightened scrutiny. *See Cook v. Bell*, 2014 UT 46, ¶ 12, 344 P.3d 634 ("[T]he right to initiative in Utah is a qualified right, subject to legislative regulation. Thus, while [citizens] may not be statutorily deprived of the right to initiative, the legislature does possess the power to define the boundaries surrounding its practice, which may have the effect of rendering the [initiative] process more difficult."); *Safe to Learn*, 2004 UT 32, ¶ 34 ("[The right to initiative] is self-limiting in that it grants to the legislature the authority to regulate the initiative process. . . . Thus, applying heightened scrutiny to each and every provision challenged under article VI, section 1 is neither required nor appropriate."); *see also Owens v. Hunt*, 882 P.2d 660, 661 (Utah 1994) ("It is axiomatic that . . . the legislature is accorded wide

latitude in complying with constitutional directives such as the one contained in article VI, section 1.").

¶90   While this court has chosen to read article VI, section 1 in a way that affords the legislature broad discretion in regulating the initiative process—and therefore subjects such regulation to a lower level of scrutiny—nothing in the language or structure of article VI, section 1 inescapably leads me to the conclusion that the directive language mandates something less than strict or heightened scrutiny be applied in these cases.

¶91   For example, the same language could also be read simply as a directive to "implement[] and enable[]" the people's right to initiative. *Gallivan*, 2002 UT 89, ¶ 28. That is, the legislature's directive is limited to providing the voters of Utah with an "orderly" framework within which they can exercise their right to initiative. *Sevier Power Co., LLC v. Bd. of Sevier Cty. Comm'rs*, 2008 UT 72, ¶ 10, 196 P.3d 583. Once the legislature establishes the channels by which the people can exercise their right to initiative, the legislature's job is complete as far as article VI, section 1 is concerned. This construction seems sound especially when considered in conjunction with fundamental right jurisprudence generally, a litigant's options when litigating right to initiative claims, and the purpose the initiative process serves.

¶92   While purporting to require "a more exacting analysis" than traditional minimum scrutiny review, *Safe to Learn*, 2004 UT 32, ¶ 37, the *Safe to Learn* standard stands in stark contrast to the strict or heightened scrutiny that courts have consistently applied in cases implicating fundamental rights. *See supra* ¶¶ 84–86. Although article VI, section 1 isn't self-executing and requires legislative implementation, this alone doesn't necessarily lead me to believe that the right to initiative should be treated differently than other fundamental rights in the context of a plain constitutional challenge. Given the general rule that legislation affecting fundamental rights is reviewed under strict or heightened scrutiny, it seems equally plausible that the directive language should be understood to operate within this framework by requiring legislative implementation that withstands heightened scrutiny.

¶93   The distinction between the right to initiative and other fundamental rights based on the directive language is even less forceful when considered alongside the alternatives to a plain constitutional challenge. Indeed, this court has held that if a litigant can plead a viable uniform operation of laws claim affecting the right

to initiative, then that claim is evaluated under heightened scrutiny because it involves the fundamental right to initiative. *See Gallivan*, 2002 UT 89, ¶¶ 36–43. In practice this creates two standards under which the same fundamental right is reviewed: heightened scrutiny when the claim also implicates uniform operation of laws and *Safe to Learn* scrutiny when the claim is based solely on the constitutional right to initiative. It seems peculiar, at the very least, to apply heightened scrutiny to uniform operation of laws claims implicating a fundamental right while denying that same level of scrutiny to claims rooted directly in the fundamental right itself.

¶94 Furthermore, the historical backdrop against which the Utah Constitution was amended to include the right to initiative seems to militate against the notion that the legislature should be afforded broad discretion in regulating the initiative process. *See supra* ¶ 81. Allowing the legislature broad discretion in regulating the initiative process undercuts the initiative process's function as a vehicle by which the people can govern themselves. In regulating the initiative process, the legislature engages in the very behavior the initiative process is meant to circumvent. Because the right to initiative acts as the people's check against the legislature, it seems unusual to treat the directive language as a means by which the legislature can check the people's right to initiative without being subjected to strict or heightened scrutiny review by the courts.

¶95 To conclude, I reemphasize that I feel bound today by this court's holding in *Safe to Learn* and therefore concur in the opinion of the court, except for Part II.C. Although *stare decisis* compels this result, I've chosen to highlight certain concerns I have regarding the standard of review announced in *Safe to Learn*. In doing so, I note that these concerns are just that—concerns—and thereby decline here to formulate any new standard or framework for analyzing article VI, section 1 claims.

———————

JUSTICE PETERSEN, dissenting:

¶96 I respectfully dissent from the majority opinion. In my view, petitioners have sufficiently shown that in this case, one provision of the Initiative Statute, which I will refer to as the Extra-Month Provision, unduly burdened Utah voters' constitutional right to initiate legislation. We have said previously that the Extra-Month Provision is not facially unconstitutional. But petitioners have brought an as-applied challenge to the Extra-Month Provision. And they have shown that in operation, it gave initiative opponents an extra thirty days to run an unopposed, unregulated campaign

against the Direct Primary Initiative after initiative sponsors Count My Vote (CMV) could no longer circulate their petition. During this time, CMV could only watch and wait. The opposition campaign caused only a tiny fraction of those who signed the Direct Primary Initiative to remove their signatures. But because of how the Initiative Statute is structured, this was enough to sink the Direct Primary Initiative. And CMV could do nothing about it because the Initiative Statute contains no cure period for sponsors to gather additional signatures.

¶97 While I understand the majority's concern with the lack of a trial court record, I find that there are sufficient undisputed facts and that the law is adequately clear for us to reach the merits of the article VI issue raised by CMV. And I conclude that CMV has shown the Extra-Month Provision unduly burdened the right of over 131,000 Utah voters to propose legislation to their fellow citizens during the 2018 general election.

¶98 Justice Himonas raises some thought-provoking concerns in his concurrence. I remain open to arguments along these lines. However, I write separately because I conclude that even under the undue burden standard outlined in *Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, 94 P.3d 217, the Extra-Month Provision is unconstitutional.

## I. THE VOTERS' RIGHT TO INITIATE LEGISLATION

¶99 Our state constitution vests legislative power in the Senate, the House of Representatives, and the "people of the State of Utah." UTAH CONST. art. VI, § 1(1). The people can exercise their legislative power by initiating their own legislation or requiring a referendum on laws passed by the legislature. *Id.* art. VI, § 1(2). With regard to the initiative right, our state constitution protects the right of "the legal voters of the State of Utah" to "initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation." *Id.* art. VI, § 1(2)(a)(i)(A). According to the text of our constitution, the initiative right is granted to Utah *voters* in the plural. It is a right of voters to associate for the purpose of proposing legislation to their fellow citizens.

¶100 To place an initiative on the ballot, voters must do so "in the numbers, under the conditions, in the manner, and within the time provided by statute." *Id.* art. VI, § 1(2)(a)(i). In this way, the constitution gives the legislature the power and responsibility to set the rules for the people's initiative process. But the initiative right is

a fundamental right included in our state constitution. *Gallivan v. Walker*, 2002 UT 89, ¶ 24, 54 P.3d 1069. And accordingly the legislature's power to regulate it is not unfettered. We have said that if a law regulating the initiative process places an "undue burden" on the initiative right, that law violates article VI, section 1 of the Utah Constitution. *See Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 35, 94 P.3d 217 (providing that "in conducting an article VI, section 1 analysis" courts must "determine whether the enactment unduly burdens the right to initiative").

## II. THE INITIATIVE STATUTE AND THE EXTRA-MONTH PROVISION

¶101 The majority opinion outlines the statute governing the initiative process. *Supra* ¶ 4. One provision of the Initiative Statute allows voters who have signed a petition to later remove their signatures (Removal Provision). *See* UTAH CODE § 20A-7-205(3)(a). A portion of the Removal Provision allows these removals to continue for an additional thirty days after initiative sponsors have submitted their signatures to county clerks and cannot gather any more.[14] *Id.* § 20A-7-205(3)(d). I refer to this as the Extra-Month Provision.

¶102 During these thirty days, there is no more initiative sponsors can do. If the removals cause the petition to drop below the number of required signatures, there is no "cure period" to obtain additional signatures. *Id.* § 20A-7-207(3).

¶103 Before analyzing how the Extra-Month Provision burdens the initiative right, it is important to understand how several of the Initiative Statute's requirements work together. First, the Initiative Statute requires that an initiative obtain a high level of support before it qualifies for the ballot. It must obtain legal signatures equal to 10 percent of all votes cast statewide for all candidates for

---

[14] The Extra-Month Provision operates as follows. The Initiative Statute requires sponsors to submit the signatures they have obtained to the appropriate county clerk by the sooner of April 15th before an election or 316 days after the day on which sponsors filed their application. UTAH CODE § 20A-7-206(1)(a). But the Removal Provision allows signers to remove their signatures up until May 15th. *Id.* § 20A-7-205(3)(d).

As the majority noted, *supra* ¶ 4 n.2, some of the relevant statutory provisions were amended in 2019. Like the majority, I reference the statutory provisions as they stood in 2018.

President in the last regular general election. *Id.* § 20A-7-201(2)(a). In the 2018 election, this meant that an initiative had to receive at least 113,143 signatures statewide. *See Verified Signatures for 2018 Initiatives*, https://elections.utah.gov/2018-initiative-numbers (last updated May 29, 2018).

¶104  Next, sponsors must show that support for the initiative is distributed throughout the state. The Senate District Requirement mandates that in twenty-six of Utah's twenty-nine senate districts, an initiative must obtain legal signatures equal to 10 percent of all votes cast in a senate district for all candidates for President in the last regular general election. UTAH CODE § 20A-7-201(2)(a).

¶105  The combination of the Extra-Month Provision and the Senate District Requirement allows initiative opponents to defeat an initiative that would otherwise meet the requirements of the Initiative Statute by obtaining the names of everyone who signed the petition, targeting a few senate districts, and approaching signers directly to solicit removals. Because an initiative must maintain a high level of support in at least twenty-six senate districts, opponents can sink an initiative by persuading a tiny fraction of signers to remove their signatures.

¶106  Most importantly, the Extra-Month Provision allows an opposition campaign to do this for thirty days after sponsors cannot gather any additional signatures. Sponsors have no chance to replace the small number of removals. *See id.* § 20A-7-207(3) ("Once a petition is declared insufficient, the sponsors may not submit additional signatures to qualify the petition for the ballot.").

¶107  On top of this, initiative opponents do not have to comply with any of the standards imposed upon initiative sponsors. Initiative sponsors must comply with numerous requirements including: (1) filing an application with the lieutenant governor that includes information about the sponsors, a copy of the proposed law, and a statement on whether signature gatherers may be paid to gather signatures, *id.* § 20A-7-202(1)–(2); (2) holding at least seven public hearings throughout Utah before circulating initiative petitions for signature, *id.* § 20A-7-204.1(1)(a); and (3) upon meeting the foregoing requirements, ensuring that signature gatherers meet the statutory requirements, *id.* § 20A-7-205(2). Opponents are not subject to any specific requirements.

¶108  The majority concludes in its analysis of CMV's equal protection and uniform operation of laws claims that initiative proponents and opponents are not similarly situated, so the

Initiative Statute does not need to treat them equally. *Supra* ¶¶ 30–32. Even accepting this as true for purposes of those analyses, whether the different treatment of proponents and opponents causes an undue burden on the initiative right is an entirely different question.

## III. UNDUE BURDEN ANALYSIS

¶109   And the answer to that question is yes, the Initiative Statute's differential treatment of proponents and opponents did unduly burden the initiative right here. While a number of provisions work together to set a high bar for initiatives to make it onto the ballot, here it was the Extra-Month Provision that crossed the constitutional line.

¶110   I have no quarrel with the general notion of allowing individual voters who have changed their minds to remove their signatures from a petition. But the majority confirms today that the statute also permits an organized opposition campaign to solicit as many removals as possible during the extra thirty days, after sponsors can gather no more signatures. And while nothing in the statute explicitly condones or even contemplates such a practice, it is correct that the statute does not explicitly prohibit it. So the same statutory language that permits an individual voter to remove his or her signature during the extra thirty days also allows an organized removal campaign to operate unopposed for a month when sponsors cannot respond with additional offsetting signatures. This disrupted CMV's ability to demonstrate that it had sufficient public support to meet statutory requirements.

¶111   To be clear, I do not argue that the law cannot allow signers to remove their names at all—just that the period within which they can do so should either end at the same time sponsors must submit their signatures to county clerks, or that sponsors must have an adequate cure period.

¶112   To determine whether a statute complies with article VI, section 1 of the Utah Constitution, we have articulated an "undue burden" test. *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 35, 94 P.3d 217. Under this test a court should analyze: (1) "whether the [legislative] enactment is reasonable," (2) "whether it has a legitimate legislative purpose," and (3) "whether the enactment reasonably tends to further that legislative purpose." *Id.* In assessing the reasonableness of the law, a court "should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose." *Id.* We have said that this

inquiry "bear[s] a resemblance to our traditional minimal scrutiny review," but "requires a more exacting analysis." *Id.* ¶ 37.

¶113 The majority criticizes this test as lacking a precise standard of scrutiny. *Supra* ¶ 47 n.7. And I am certainly open to clarifying our case law in this area. But the undue burden test is currently controlling precedent. And it is what CMV had to work with. Accordingly, I apply our precedent to the facts and arguments CMV has advanced.

¶114 The second and third steps of the undue burden test are not really in dispute. The Removal Provision in general has a legitimate legislative purpose. Its purpose is to allow petition signers to remove their signatures.[15] The lieutenant governor's briefing does not identify any other purposes of the Removal Provision.[16] This court has long said that voters have a right to remove their signatures from a petition. *Halgren v. Welling*, 63 P.2d 550, 556 (Utah 1936). And I do not contend otherwise.

¶115 And it is clear that the Removal Provision reasonably tends to further this purpose. It directly provides a mechanism for voters who change their minds for whatever reason to remove their signatures from a petition. Notably, however, the law could still

---

[15] In determining the legislative purpose of an enactment, a court may consider any rational purpose that "can be reasonably imputed to the legislative body." *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 36, 94 P.3d 217 (citation omitted) (internal quotation marks omitted).

[16] Intervenor Keep My Voice argues that preventing fraud is a purpose of the Removal Provision. However, there are specific provisions in the Initiative Statute that directly address the integrity of the initiative process and entrust county clerks with validating signatures and confirming those signatures are linked to registered Utah voters. UTAH CODE §§ 20A-7-206(2)–(3), -206.3. And the Removal Provision is not directed at or limited to fraud prevention. It does not limit removals to those instances when a signer claims his or her signature was fraudulently obtained or forged. If the Removal Provision were so limited, it would be a much narrower provision and the undue burden analysis would be very different. But the Removal Provision is not limited in this way. Rather, it allows a signer to remove his or her signature for any reason.

accomplish its purpose of permitting signers to remove their names without allowing them to do it for an additional thirty days after sponsors have relied upon those signatures and cannot obtain any more. And the other alternative, providing initiative sponsors with a cure period, would not impede or truncate signers' ability to remove their signatures at all.

¶116 It is with regard to the first step, the reasonableness inquiry, that the Extra-Month Provision runs into constitutional trouble. To assess reasonableness, we weigh the extent that the right to initiate legislation is burdened against the importance of the legislative purpose. *See Safe to Learn*, 2004 UT 32, ¶ 35.

¶117 With regard to determining the extent to which the challenged provisions burden the initiative right, the majority concludes that we do not have sufficient, undisputed facts. *Supra* ¶¶ 52–53. And I agree that a record is usually necessary to assess whether a law unduly burdens the initiative right, because it is largely a question of fact. As this court explained in *Cook v. Bell*,

> In contemplating the quantitative level at which restrictions cross the threshold from constitutional regulation to an unconstitutional abrogation of the fundamental right to initiative, courts consider the qualitative net effect of all the relevant statutory restrictions. Whereas in isolation a provision may not rise to the level of being unduly burdensome, the combined effect of multiple, otherwise permissible, provisions may cross that threshold.

2014 UT 46, ¶ 18, 344 P.3d 634.

¶118 It is generally difficult to assess the "qualitative net effect" of the relevant statutory restrictions without a record. But here, we can proceed with the facts before us. This is because CMV is not arguing that the Initiative Statute's requirements are too difficult to meet. Rather, they essentially argue that an opposition campaign used the Extra-Month Provision to run an unopposed, overtime removal effort. And this disrupted the process in a manner that burdened CMV's ability to show that the Direct Primary Initiative did have sufficient public support to meet the Initiative Statute's requirements. The facts they have provided are sufficient to show this.

¶119 CMV has demonstrated that the Extra-Month Provision led to the Direct Primary Initiative's defeat. The lieutenant governor's webpage showed that CMV submitted 159,881 signatures to county clerks statewide. *See Verified Signatures for 2018 Initiatives*,

https://elections.utah.gov/2018-initiative-numbers (last updated May 29, 2018). As required by statute, the county clerks then verified the signatures and removed any that did not meet the required standards. *See id.* After discounting those signatures, CMV had gathered 131,984 signatures statewide, with a sufficient number of signatures in twenty-six of the twenty-nine senate districts to be placed on the ballot. *Id.* In total, the Direct Primary Initiative had 18,841 signatures more than was necessary to qualify for the ballot. *See id.*

¶120   But after CMV could no longer circulate its petitions, Keep My Voice began its removal campaign. Keep My Voice obtained the names of voters who had signed the Direct Primary Initiative petition. They targeted three senate districts, went to individual signers' doors with removal forms, and attempted to persuade signers to remove their signatures.

¶121   At the end of their thirty-day campaign, Keep My Voice submitted completed removal forms *en masse* to the lieutenant governor. After counting these removals, the lieutenant governor determined that while CMV still more than met the statewide 10 percent requirement, the removals caused the Direct Primary Initiative to fall short in the three districts Keep My Voice targeted by a slim margin: in District 7 by 182 signatures, District 21 by 179 signatures, and District 29 by 211 signatures.

¶122   Because CMV had no opportunity to return to those districts and cure the slim shortfall, an initiative that over 131,000 Utah voters wanted to propose was blocked by a margin of 572 removed signatures.

¶123   This data shows that, in operation, the Extra-Month Provision burdened the initiative process in two important ways. First, the statutory thresholds, challenging to begin with, became illusory. They were moving targets that CMV could not pin down until it was too late. This presents a problem for any initiative effort. How many additional buffer signatures are enough to hold off an opponent that might materialize after sponsors submit their signatures? Initiative sponsors cannot know the answer to this question until it is too late to do anything about it.

¶124   Second, the statute's different deadlines for submitting and removing signatures permit the process to become unfair and as a result, inaccurate. If a proposition faces an organized removal campaign—which happened here and which the majority says is permitted by the Initiative Statute—the process no longer accurately

measures whether public support for the initiative meets the "numbers" set by the legislature. Here, it was not that the Initiative Statute's requirements were too difficult for CMV to meet; it was that the Extra-Month Provision (and the removal campaign it allowed) disrupted CMV's ability to demonstrate it could meet those requirements. Even an initiative that has enough support to meet the Initiative Statute's requirements risks being blocked from the ballot.

¶125   In arguing that the Initiative Statute does not burden the initiative right, the lieutenant governor points out that three initiatives did qualify for the 2018 ballot. I agree that an initiative might not be impacted at all if it does not face a meaningful removal campaign. This was the case with two of the initiatives that qualified for the ballot in 2018.[17] But the burden caused by the Extra-Month Provision cannot be judged based only on how it impacts those initiatives that do not suffer its full effects. CMV's as-applied challenge shows that when an initiative is opposed by an organized removal campaign, the process no longer works fairly or accurately.

¶126 And the third example provided by the lieutenant governor—Medical Cannabis—provides further evidence that the Extra-Month Provision unduly burdens the initiative right. Medical Cannabis qualified for the 2018 ballot with the most signatures of any initiative. And voters approved the proposition during the 2018 general election, which is the best indicator of overall support for the initiative. But because it faced a removal campaign, Medical Cannabis almost did not qualify for the ballot at all.

¶127   Medical Cannabis received 153,894 valid signatures, but it also received 1,425 signature removals. *See Verified Signatures for 2018 Initiatives*, https://elections.utah.gov/2018-initiative-numbers (last updated May 29, 2018). These removals nearly caused Medical Cannabis to fall short of the signatures needed in two of the twenty-seven districts where it had met the signature requirements. *Id.* Medical Cannabis satisfied the signature requirements in District 22 by a mere thirty-five signatures and in District 29 by just sixty-nine signatures. *Id.* That is telling evidence that the

---

[17] The lieutenant governor's election website cited zero valid removed signatures with respect to Independent Redistricting and four valid removed signatures with respect to Utah Decides Healthcare. *See Verified Signatures for 2018 Initiatives*, https://elections.utah.gov/2018-initiative-numbers (last updated May 29, 2018).

Extra-Month Provision threatens to "thwart[] the placement on the ballot of widely supported initiatives." *Gallivan v. Walker*, 2002 UT 89, ¶ 50, 54 P.3d 1069. An initiative that was actually approved in the general election by a majority of voters would not have been on the ballot if opponents would have caused just 104 more signers to remove their names.

¶128 In my view, the information before us shows that the removal campaign against the Direct Primary Initiative—as permitted by the Extra-Month Provision—disrupted the initiative process in a way and to a degree that sponsors could not predict and to which they could not respond. In this way, the Extra-Month Provision placed a heavy burden on the initiative right.

¶129 The next question in assessing reasonableness is how important the legislative purpose of permitting signature removals is in comparison to the heavy toll it took on the initiative right here. In examining this, it is telling that the law does not permit mind-changing in other analogous contexts. For example, in an actual election, the Election Code does not permit voters to go back to the county clerk and change their votes, and certainly not *after* election day. The reason is obvious—it would erode the finality, certainty, and efficiency of our elections.

¶130 Another section of the Election Code provides that individuals may qualify for the primary election ballot if they submit a nomination petition that was "signed by at least 2% of the registered political party's members who reside in the political division of the office that the individual seeks." UTAH CODE § 20A-9-403(3)(a)(ii). But the Election Code does not allow voters to remove their signatures from candidate nomination petitions at all and certainly not after those petitions have been filed.

¶131 Fundamentally, in the initiative, referendum, nomination, and election processes, the law imposes deadlines by which voters know they must make a choice. Voters understand this—they generally are unable to go back to the county clerk and change their votes. This does not mean that permitting mind-changing has no value, just that it is not something that is typical, expected, or sacrosanct in our election process.

¶132 And extending removals for an additional thirty days is not necessary to promote the basic purpose of allowing signers to remove their signatures. The purpose could still be achieved even if the deadline for removals and submissions were the same. Or if sponsors were given a cure period, the initiative right could be

40

protected without modifying or shortening signers' ability to remove their signatures at all.

¶133 The Extra-Month Provision in its current form allows opponents of an initiative to run an unopposed removal campaign for a month after sponsors have submitted their signatures. This is done at the expense of Utah voters' right to initiate legislation. CMV has shown that, here, the result was that a widely supported initiative was blocked from the ballot.

IV. OUR PRECEDENT IN *SAFE TO LEARN* AND *HALGREN*

¶134 This court addressed a challenge to the Removal Provision in much the same form in *Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, 94 P.3d 217. The lieutenant governor argues we are bound by our decision in that case that the Removal Provision did not unduly burden the initiative right. But this misapprehends the nature of the undue burden analysis, and the very different evidence that was before us in *Safe to Learn*.

¶135 In *Safe to Learn*, the appellants were faced with the prospective application of, among other provisions, the then-existing signature removal provision.[18] *Id.* ¶ 6. After *Safe to Learn* sponsors had filed their initiative application, an amended initiative statute with additional requirements went into effect. *Id.* ¶¶ 4–5. The lieutenant governor notified sponsors that they would have to comply with some of those new requirements. *Id.* ¶ 5. The sponsors filed a lawsuit challenging five provisions of the amended initiative statute, four of which were introduced by the amendments, and the then-existing removal provision, which existed in the statute previously and was retained in the amendments. *Id.* ¶ 6. But these provisions, including the removal provision, had not yet been applied to their petition. *See id.* ¶¶ 5–6. Because the statute had not yet been applied to them, the sponsors could mount only a facial

---

[18] The Removal Provision in effect at the time of this initiative petition differs from the then-existing signature removal provision in that it does not require voters seeking removal of their signature to submit a notarized statement. Instead, it requires voters seeking removal of their signature to submit a statement that includes the voter's name, resident address, and signature. *See* UTAH CODE § 20A-7-205(3)(b)(i). I agree with the majority that these differences are inconsequential for the purpose of distinguishing *Safe to Learn* from this case.

challenge. Unlike CMV, they had no evidence of the burden the removal provision had caused them in operation.

¶136   I agree that without such evidence, speculation that the Removal Provision will unduly burden an initiative based only on the statutory language is insufficient to overcome the presumption of constitutionality. And that is all we had in *Safe to Learn*. On that record, we reiterated this court's holding in *Halgren v. Welling*, 63 P.2d 550 (Utah 1936), that a signer has a right to withdraw his or her signature. *See Safe to Learn*, 2004 UT 32, ¶¶ 47, 49.

¶137   This court held in *Halgren* that petition signers should be permitted to withdraw their signatures "at any time before the petition has been acted upon." 63 P.2d at 556. We concluded this as a matter of common law, noting that "[t]here is no provision in the Initiative and Referendum Law of the State of Utah relating to the withdrawal of names from a petition after it has been once signed." *Id.* But in *Halgren*, this court was not faced with a constitutional question of any kind and certainly not the argument CMV advances that the Removal Provision violates article VI of the Utah Constitution. In *Halgren*, this court simply held that, as a matter of common law, an individual signer has the right to remove his or her signature from a petition. *See id.* at 560–61. That does not answer the question before us now—whether the undisputed evidence shows that as applied to the Direct Primary Initiative, the Extra-Month Provision unduly burdened Utah voters' initiative right.

¶138   In contrast to *Halgren* and *Safe to Learn*, we are faced with an as-applied challenge to the Extra-Month Provision with data showing how it operated to defeat the Direct Primary Initiative. In *Safe to Learn*, this court "recognize[d] the potential difficulty [the signature removal] provision may cause to initiative sponsors." 2004 UT 32, ¶ 49. But here, CMV has presented us with evidence of the actual burden the Extra-Month Provision caused the Direct Primary Initiative.

¶139   Assessing whether an undue burden exists is a fact-based analysis. The appellants in *Safe to Learn* challenged the then-existing removal provision on its face, and that challenge failed to overcome the presumption of constitutionality. *See id.* ¶¶ 60–61. But CMV has presented us with evidence of how the Extra-Month Provision operated in practice, as applied to the Direct Primary Initiative. Our holding in *Safe to Learn* does not prevent us from analyzing the evidence before us here, in accordance with the legal standards we outlined in that case.

Petersen, J., dissenting

## CONCLUSION

¶140   CMV has amply demonstrated that in their case, the Extra-Month Provision unduly burdened the right of over 131,000 Utah voters to propose the Direct Primary Initiative to their fellow citizens. For this reason, I dissent.

———————